MORRIS ET AL. *v.* SAVOY.

[Cite as *Morris v. Savoy* (1991), 61 Ohio St.3d 684.]

(No. 89–1807—Submitted February 20, 1991—Decided August 27, 1991.)

*Jeffries, Kube & Monteleone Co., L.P.A., J. Michael Monteleone* and *Richard A. Vadnal,* for petitioners.

*Jacobson, Maynard, Tuschman & Kalur Co., L.P.A., Robert C. Maynard, Jerome S. Kalur, Thomas H. Terry III* and *Robert C. Seibel,* for respondent.

*Jeffrey R. White* and *John K. Fitch,* urging unconstitutionality for *amici curiae,* Association of Trial Lawyers of America, Consumer Federation of America and Dissatisfied Parents Together.

*Frank A. Ray, Michael S. Miller* and *Jeffrey L. Maloon,* urging unconstitutionality for *amicus curiae,* Ohio Academy of Trial Lawyers.

*Weisman, Goldberg, Weisman & Kaufman, Fred Weisman, Greene & Hennenberg, William Martin Greene* and *Jean M. McQuillan,* urging unconstitutionality for *amicus curiae,* National Spinal Cord Injury Association.

*Dinsmore & Shohl, John E. Schlosser* and *Frank C. Woodside III,* urging constitutionality for *amici curiae,* Children's Hospital Medical Center and St. Elizabeth Medical Center.

*Thompson, Hine & Flory, Gerald L. Draper, Robert D. Monnin* and *Margaret R. Carmany,* urging constitutionality for *amicus curiae,* Defense Research Institute, Inc.

*Lee I. Fisher,* Attorney General, and *Simon B. Karas,* urging constitutionality for *amicus curiae,* Ohio Attorney General.

---

WRIGHT, J. This court has not considered either of the statutes challenged by petitioners in this case—a remarkable fact given the age of the statutes and the limits they place on recovery by medical malpractice victims. The statutes were part of the General Assembly's response in 1975 to a perceived health care crisis prompted by escalating medical malpractice insurance premiums.

For the reasons set forth below, we hold that that response was unconstitutional in R.C. 2307.43, by setting a $200,000 cap on general damages that may be awarded for medical malpractice. This answer will serve as a response to the first and second questions posed by the district court.

Question three requires a threshold determination of constitutionality of R.C. 2305.27 regarding limits on the collateral source rule followed by a specific finding as to the intent of the legislature in its application to future payments.[1] We find that the statute is constitutional and that it was intended to reach future payments capable of being calculated with reasonable certainty.

I

The Ohio Medical Malpractice Act ("Act") was passed as a result of the turmoil that swept the nation in the early 1970s with the medical fraternity predicting dislocation of medical care as the result of soaring malpractice rates. The Act, finally enacted by Am.Sub.H.B. No. 682, 136 Ohio Laws, Part II, 2809, 2813, was introduced in the General Assembly on April 15, 1975, in H.B. No. 682. 136 House Journal, Part I, 687. As introduced, the bill did not contain any limit on the amount of general damages recoverable from either physicians or hospitals. It did provide for abrogation of the collateral source rule. H.B. No. 682, lines 199 to 201, proposed R.C. 2743.02(C). Just two months later, on June 17, a bill much altered in committee and now containing a $200,000 cap on general damages for any medical claim was passed by the

---

1. The third question could be interpreted as assuming constitutionality and asking only for statutory interpretation. However, at our request, Judge Bell clarified his order by stating that he wanted the court's determination whether the statute violated the Ohio Constitution. See (1990), 53 Ohio St.3d 709, 559 N.E.2d 1366; (1990), 54 Ohio St.3d 707, 561 N.E.2d 941.

House and sent to the Senate. 136 House Journal 1217; Sub.H.B. No. 682, lines 469 to 472, proposed R.C. 2743.161. While the bill was in a Senate committee, the Ohio State Medical Association informed the legislature on July 1 that "within the next several days, the number of physicians unable to continue medical practice in Ohio because of lack of adequate malpractice coverage will reach crisis proportions." Gongwer News Service, Inc., Ohio Report (July 1, 1975) 3. There was an attempt, while the bill was in the Senate, to place a cap on *all* damages at $500,000, but the amendment was defeated by a vote of eighteen to fourteen. 136 Senate Journal 889. Also during Senate consideration, R.C. 2305.27 was added to require a reduction in a plaintiff's recovery by the amount received from collateral sources. 136 Senate Journal 888. In its final form, the abrogation of the collateral source rule did not affect payments resulting from policies or contracts paid for by plaintiffs or their employers. 136 Senate Journal 950; 136 House Journal 1643–1644. On July 28, the Act was signed into law by Governor James A. Rhodes. The emergency nature of the Act was posited as follows: "The reason for such necessity lies in the fact that immediate action is necessary to insure a continuance of health care delivery to the citizens of Ohio." Am.Sub. H.B. No. 682, Section 8; 136 Ohio Laws, Part II, 2843–2844.

The Act amended ten sections of the Ohio Revised Code and created twenty-six new statutes. The sweep was broad. Among the changes were provisions for compulsory (though nonbinding) arbitration, R.C. 2711.21, and an altered statute of limitations, R.C. 2305.11, principally to eliminate the actuary's nightmare, "long-tail liability." The legislature also established limits on the amounts recoverable in general, or noneconomic, damages and required a setoff for payments from collateral sources. In the last fifteen years, this court has had occasion to rule on the constitutionality of only three statutes in that Act, upholding two,[2] but finding portions of a third unconstitutional.[3]

---

2. R.C. 2743.43, regarding qualifications for expert medical witnesses, was upheld in *Denicola v. Providence Hosp.* (1979), 57 Ohio St.2d 115, 11 O.O.3d 290, 387 N.E.2d 231. R.C. 2711.21(C), regarding arbitration panels in medical malpractice cases, was upheld in *Beatty v. Akron City Hosp.* (1981), 67 Ohio St.2d 483, 21 O.O.3d 302, 424 N.E.2d 586.

3. This court has considered elements of R.C. 2305.11(A) and (B) in several cases. In *Vance v. St. Vincent Hosp. & Medical Ctr.* (1980), 64 Ohio St.2d 36, 18 O.O.3d 216, 414 N.E.2d 406, the court upheld a one-year statute of limitations for minors ten years and older (though not on constitutional grounds). *Vance* was overruled in *Schwan v. Riverside Methodist Hosp.* (1983), 6 Ohio St.3d 300, 6 OBR 361, 452 N.E.2d 1337, when the court held that the four-year statute of repose was unconstitutional as to the different treatment accorded minors under ten years of age and those over ten. The court said it could find no rational basis for tolling the statute for those younger than ten, but not for those older. In *Opalko v. Marymount Hosp., Inc.* (1984), 9 Ohio St.3d 63, 9 OBR 267, 458 N.E.2d 847, the court explained *Schwan* as invalidating only the pre- and post-ten-years-old distinction contained in R.C. 2305.11(B), not the four-year limitation

## II

Following the events that produced the malpractice damage caps, there has been a lengthy convalescence with the remedy being examined for any unconstitutional side effects. It has been found wanting in the majority of instances where the issue has been litigated, though the rationale for overturning damage caps has varied widely.

State supreme court cases that have found such violations include:

*Kansas Malpractice Victims Coalition v. Bell* (1988), 243 Kan. 333, 757 P.2d 251 (violates rights to trial by jury, adequate remedy, and due course of law); *Lucas v. United States* (Tex.1988), 757 S.W.2d 687 (violates constitution's open courts guarantee); *Smith v. Dept. of Ins.* (Fla.1987), 507 So.2d 1080 (violates right of access to courts); *Carson v. Maurer* (1980), 120 N.H. 925, 424 A.2d 825 (violates equal protection guarantee); *Arneson v. Olson* (N.D.1978), 270 N.W.2d 125 (violates equal protection); *Jones v. State Bd. of Medicine* (1976), 97 Idaho 859, 555 P.2d 399 (remanded to apply heightened equal protection standard); and *Wright v. Central Du Page Hosp. Assn.* (1976), 63 Ill.2d 313, 347 N.E.2d 736 (violates constitutional prohibition against special privilege).

Those that have upheld malpractice injury caps include:

*Etheridge v. Medical Ctr. Hospitals* (1989), 237 Va. 87, 376 S.E.2d 525; *Williams v. Kushner* (La.1989), 549 So.2d 294; *Fein v. Permanente Medical Group* (1985), 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665, appeal dismissed (1985), 474 U.S. 892, 106 S.Ct. 214, 88 L.Ed.2d 215 (White, J., dissenting); *Johnson v. St. Vincent Hosp., Inc.* (1980), 273 Ind. 374, 404 N.E.2d 585; and *Prendergast v. Nelson* (1977), 199 Neb. 97, 256 N.W.2d 657.

The determination of constitutionality needs to be tempered by the fact that, in two of the five cases cited, the courts noted the existence of an insurance fund that acted as a quid pro quo for plaintiffs' loss of unlimited recovery for pain and suffering.

Our standards for review of this statute, challenged on due process and equal protection grounds, are the same as we used in *Mominee v. Scherbarth* (1986), 28 Ohio St.3d 270, 28 OBR 346, 503 N.E.2d 717, and in *Schwan v. Riverside Methodist Hosp.* (1983), 6 Ohio St.3d 300, 6 OBR 361, 452 N.E.2d 1337. In *Mominee*, we held that: "A legislative enactment will be deemed valid on due process grounds ' * * * [1] if it bears a real and substantial

---

itself, which the court upheld. Finally, in *Mominee v. Scherbarth* (1986), 28 Ohio St.3d 270, 28 OBR 346, 503 N.E.2d 717, this court ruled R.C. 2305.11(B) unconstitutional as applied to minors on the grounds that it violated the due course of law provisions of the Ohio Constitution.

relation to the public health, safety, morals or general welfare of the public and [2] if it is not unreasonable or arbitrary.'" *Id.*, 28 Ohio St.3d at 274, 28 OBR at 349–350, 503 N.E.2d at 720–721, quoting *Benjamin v. Columbus* (1957), 167 Ohio St. 103, 4 O.O.2d 113, 146 N.E.2d 854, paragraph five of the syllabus. In *Schwan*, we agreed to an equal protection analysis that utilized the "rational basis" test because that case, like this one, did not involve a fundamental right or suspect class. *Id.*, 6 Ohio St.3d at 301, 6 OBR at 361, 452 N.E.2d at 1338. "'* * * Consequently, the statute must be upheld if there exists any conceivable set of facts under which the classification rationally furthered a legitimate legislative objective.' (Citation deleted.) *Denicola v. Providence Hospital* (1979), 57 Ohio St.2d 115, 119 [11 O.O.3d 290, 293, 387 N.E.2d 231, 234]." *Id.*

## Due Process

Although this statute is before the court for the first time, R.C. 2307.43 is no stranger to lower courts. See, *e.g.*, *Graley v. Satayatham* (C.P.1976), 74 O.O.2d 316, 343 N.E.2d 832; *Duren v. Suburban Community Hosp.* (C.P.1985), 24 Ohio Misc.2d 25, 24 OBR 450, 495 N.E.2d 51. Of all the Ohio authority cited by the litigants in this case, there is only one case where the constitutionality of R.C. 2307.43 was analyzed and upheld. *Keeton v. Mansfield Obstetrics & Gynecology* (Mar. 5, 1981), N.D.Ohio No. C80–1573A, unreported. Even there, Judge Contie's opinion was harshly critical of what he saw as shifting the risk from the health care providers to the health care recipients in response to the "crisis" in medical care.[4] The merits of such a shift are for the legislature to decide. This court's function is only to determine whether the method employed bears a "real and substantial relationship" to public health or welfare or whether it is "unreasonable or arbitrary." Despite his obvious antipathy towards the Act, Judge Contie upheld the constitutionality of the statute. Since that time, this court has adopted a rule[5] allowing certification of questions of state law from the

---

4.  "* * * This legislation * * * is designed to relieve health care providers and insurers from the financial strains of the high cost of malpractice insurance. * * *

"* * * The Court has not been able to locate any authorities that contend that due to the high cost of malpractice insurance, it is no longer profitable to be a health care provider. What is more likely is that due to rising malpractice insurance costs, it is not as profitable as it was previously. * * *

"The Court's questioning of the reasoning underlying this legislation is not aimed at doubting whether there really exists a medical malpractice insurance crisis. Rather, the Court's only purpose is to point out that the real rationale behind the legislation is not to guarantee that health care services will be provided to all citizens. The real rationale for this legislation is that the legislation is aimed at shifting the risk of practicing medicine from the health care provider to the health care receiver." *Keeton, supra*, at 12–13.

5.  Rule XVI of the Rules of Practice of the Supreme Court.

federal courts, affording this court the opportunity to revisit the issue that so troubled Judge Contie. The language of the Act clearly shows that it was aimed at malpractice insurance rates, which had been rising rapidly in the years previous. Section 5 requires an annual report from the state Superintendent of Insurance on the "effectiveness" of fifteen of the Act's thirty-six statutes " * * * in reducing medical malpractice insurance premiums * * *." 136 Ohio Laws, Part II, 2842. R.C. 2307.43 is not listed among the statutes that the legislature obviously believed would have an impact on insurance premiums. There are twenty-one statutes not covered by the survey and sixteen relate to the creation and operation of the medical malpractice underwriting association. Of the remaining five, R.C. 1739.02 subjects hospital service associations to the new statutes on the underwriting association, R.C. 2743.02 is a waiver of immunity for public hospitals, and R.C. 2305.11 is a statute of limitations and a statute of repose for medical malpractice. In *Mominee*, this court held provisions of that statute unconstitutional as it related to minors, in part because it was not included among the statutes to be surveyed for their impact on insurance rates. The only two other statutes in the Act left out of the survey are the two challenged here. We are unable to find, either in the *amici* briefs or elsewhere, any evidence to buttress the proposition that there is a rational connection between awards over $200,000 and malpractice insurance rates. There is evidence of the converse, however. The Supreme Court of Texas found no relationship between insurance rates and the cap, citing an independent study that showed that less than .6 percent of all claims brought were for more than $100,000. *Lucas v. United States* (Tex.1988), 757 S.W.2d 687, 691. According to three *amici* arguing against the statute's constitutionality,[6] a 1987 study by the Insurance Service Organization, the rate-setting arm of the insurance industry, found that the savings from various tort reforms, including a $250,000 cap on noneconomic damages, were "marginal to nonexistent." Neither respondent nor any of the *amici* who argued in favor of the statute has offered evidence that the damage cap has been a factor in medical malpractice insurance rate setting. Conceivably, such evidence may exist, but that would require a second trip to the General Assembly.

On the second prong of the analysis set forth in *Mominee, supra*, whether the statute is unreasonable or arbitrary, we note with approval the following excerpt from an opinion of the Court of Appeals for Stark County regarding R.C. 2307.43:

---

6. Brief of *amici curiae* Association of Trial Lawyers of America, Consumer Federation of America and Dissatisfied Parents Together, at 24.

" * * * [I]t is irrational and arbitrary to impose the cost of the intended benefit to the general public solely upon a class consisting of those most severely injured by medical malpractice. * * * " *Nervo v. Pritchard* (June 10, 1985), Stark App. No. CA–6560, unreported, at 8.

We hold, therefore, that R.C. 2307.43 is unconstitutional because it does not bear a real and substantial relation to public health or welfare and further because it is unreasonable and arbitrary.

### Equal Protection

As noted above, our examination of authorities on this issue includes opinions from several other states dealing with caps on damages. Most have wrestled with the issue of equal protection. In *Richardson v. Carnegie Library Restaurant, Inc.* (1988), 107 N.M. 688, 694, 763 P.2d 1153, 1159, the Supreme Court of New Mexico held, in a case involving a cap on dramshop liability, that the requirements of equal protection do not " 'prohibit classification for legislative purposes, provided that there is a rational and natural basis therefor, that is based on a substantial difference between those to whom it does and those to whom it does not apply * * *.' " The test for one who challenges a statute's constitutionality is to demonstrate either that there was no rational basis for the creation of the class itself or that those within the class are not being treated equally in the furtherance of a legitimate governmental interest.

The Act itself, by addressing the malpractice issue, created two classes: medical malpractice victims and all other tort victims. Equal protection of the laws requires the existence of reasonable grounds for making a distinction between those within and those outside a designated class. *State v. Buckley* (1968), 16 Ohio St.2d 128, 45 O.O.2d 469, 243 N.E.2d 66. Assuming the existence of a crisis in the medical malpractice insurance area, we do not take issue on equal protection grounds with the legislature's determination to respond as it did with the Act. For example, in *Denicola v. Providence Hosp.* (1979), 57 Ohio St.2d 115, 11 O.O.3d 290, 387 N.E.2d 231, this court upheld the constitutionality of the Act's limitations on medical malpractice experts contained in R.C. 2743.43. We found that that classification—qualifications for experts in medical claims not applied to expert witnesses in other malpractice cases—rationally furthered a legitimate legislative objective. However, "[l]egislation must apply alike to all persons within a class * * *." *Porter v. Oberlin* (1965), 1 Ohio St.2d 143, 30 O.O.2d 491, 205 N.E.2d 363, paragraph two of the syllabus. R.C. 2307.43 deals with damages in medical claims, but treats members of the class of medical damage claimants in radically different fashion. First, the statute applies only to claims "not involving death." Respondent contends that this distinction is immaterial because Section 19a,

Article I of the Ohio Constitution forbids a limit on damages recoverable in wrongful death actions. The fact that the Constitution prohibits treating one portion of a class in the desired fashion surely is not license to subject the balance of the class to disparate treatment. Second, and more importantly, the statute treats the most seriously injured malpractice victims differently from the rest of the class. To this, respondent replies: "The legislature intended to ease the burden of exorbitant awards of noneconomic damages to facilitate continuous delivery of health care in Ohio. * * * Whether it is the best method or whether it will accomplish its goal, is not a decision for the courts." We would emphasize that we are not concerned with the wisdom of the Act. However, respondent cites no evidence to support his contention regarding this purported easing of the burden of alleged "exorbitant" malpractice awards. The American Heritage Dictionary of the English Language (1981) defines "exorbitant" as "Out of all bounds" or "extravagant." While it is not determinative of this issue, we are loath to assume that any amount above $200,000 for pain and suffering is "exorbitant" in a malpractice case, like this one, involving such grievous injuries and continuing pain and suffering. The vast weight of authority requires that, when utilizing the "rational basis" test, the courts defer to the legislature on the issue of constitutionality. "We do not inquire whether this statute is wise or desirable * * *. * * * Misguided laws may nonetheless be constitutional." *James v. Strange* (1972), 407 U.S. 128, 133, 92 S.Ct. 2027, 2031, 32 L.Ed.2d 600, 606. Neither precedent nor deference, however, requires that we blind ourselves when confronted with a challenge involving something other than a fundamental right or suspect class. Someone once said that if tempted by a sense of humanity, treat it not as a weakness, but grant it a measure of consideration.

Having urged consideration, though, we stop short of finding the statute defective on equal protection grounds, despite the disparate treatment within the class. Using the "any conceivable set of facts" test of *Schwan* supports a rational-basis argument for the distinctions made in this statute.

III

Our finding regarding the unconstitutionality of R.C. 2307.43 on due process grounds disposes of the second question posed by the district court, *i.e.,* whether the limitation on awards of general damages applies to limit aggregate recovery by all claimants arising out of a single medical claim. It having been decided that the limitation is unconstitutional, the second question becomes moot.

## IV

When we subject R.C. 2305.27 to the same equal protection and due process analysis, we achieve a different result. Again, a line is drawn—the statute covers only a "medical claim"—but does not make any internal distinctions among class members. All plaintiffs in medical malpractice must confront the same setoff of benefits from collateral sources. We find no constitutional infirmities involving equal protection with such a provision.

As noted above, R.C. 2305.27 was not included in the statutes to be surveyed for their impact on malpractice insurance rates. The statute limits certain types of double recovery, specifically those which would duplicate recovery from funds that are directly, or indirectly, supported by the general public or the business community, *e.g.*, public welfare or workers' compensation and unemployment compensation. The malpractice victim's recovery is not reduced by the benefits of traditional insurance policies purchased by either himself or his employer. While it is not clearly apparent that there is a substantial relationship between the setoff and malpractice insurance rates, it does not appear to be unreasonable or arbitrary to deny a *double* recovery. Such a proposition surely does not offend fundamental fairness. Such a setoff may inure to the benefit of the tortfeasor, but it does not do so to the detriment of the victim as does the damage cap of R.C. 2307.43 as discussed above. Consequently, in answer to the first part of the third question certified by the district court, we hold R.C. 2305.27 to be constitutional.

Finally, there is the issue of the application of this statute to future payments. The language of the statute requires that "* * * an award of damages * * * shall be reduced by *any* other collateral recovery for medical and hospital care, custodial care or rehabilitation services, and loss of earned income." (Emphasis added.) R.C. 2305.27. The sole issue is the impact of this language on future workers' compensation payments the plaintiff could reasonably expect to receive and whether there should be an equivalent reduction in the jury's award of $600,000 for future lost wages. Reading the language of the statute consistent with our finding that the legislature intended to eliminate certain types of double recovery, we find that future payments, to the extent they can be determined with a reasonable degree of certainty, can and should be deducted from the jury's verdict for future lost wages. Such was the case here.

*Judgment accordingly.*

MOYER, C.J., and H. BROWN, J., concur.

H. BROWN, J., concurs separately.

HOLMES, J., concurs in part and dissents in part.

SWEENEY and RESNICK, JJ., concur in part and dissent in part.

DOUGLAS, J., not participating.

HERBERT BROWN, J., concurring. I am in agreement with the analysis of the constitutional issues contained in the majority opinion by Justice Wright. I write separately only to comment on an issue not raised by the questions certified to us by the district court, but which will be presented in the case to which the certification relates.[7]

R.C. 2305.27 provides:

"Except as provided in section 2743.02 of the Revised Code, in any medical claim, as defined in division (D) of section 2305.11 of the Revised Code, *an award of damages shall not be reduced by insurance proceeds or payments or other benefits paid under any insurance policy or contract where the premium or cost of such insurance policy or contract was paid either by or for the person who has obtained the award, or by his employer * * *.*" (Emphasis added.)

R.C. 2305.27 prohibits the reduction of an award of damages by any amounts paid under any insurance policy where the premium or cost of the policy is paid for by the employer of the person who obtains the award.

This court has recognized that the workers' compensation laws are " * * * founded upon the principle of insurance * * *." See *State, ex rel. Crawford, v. Indus. Comm.* (1924), 110 Ohio St. 271, 274, 143 N.E. 574, 575. Indeed, this court has referred to workers' compensation as "workmen's compensation insurance." *Id.* at syllabus. See, also, *id.* at 276, 143 N.E. at 575. Throughout R.C. Chapter 4123,[8] the General Assembly uses terms such as "state insurance fund," "insurance fund," "self-insurers," "premiums," "coverage," and other similar terms and phrases consistent with the concept of insurance. Further, as this court indicated in *Blankenship v. Cincinnati Milacron Chemicals* (1982), 69 Ohio St.2d 608, 615, 23 O.O.3d 504, 509, 433 N.E.2d 572, 577, an employer who commits an "intentional tort" against his or her employee is not immune from liability simply because the employer complies with the workers' compensation laws since "[a]n *insurance policy* does not

---

7. Further, neither party has argued the issue in his brief, and on a question of this significance, I believe we should have briefs and arguments before rendering a decision.

8. See, generally, R.C. 4123.01 *et seq.* See, specifically (as just a few of many such examples), R.C. 4123.01(A)(1)(b), 4123.03, 4123.05, 4123.29, 4123.30, 4123.32, 4123.34, 4123.342, 4123.35(A), 4123.38, 4123.74 and 4123.79.

protect the *policy holder* from the consequences of his intentional tortious act." (Emphasis added.)

The laws governing workers' compensation establish an insurance scheme whereby employers pay for "insurance" coverage to compensate their employees for injuries sustained during the course of employment. Thus, workers' compensation benefits may constitute (within the meaning of R.C. 2305.27) payments under an insurance policy or contract where the premium or cost of the policy is paid for by the employer of the person who obtains the award.

However, the district court did not certify the question of what constitutes "insurance" under R.C. 2305.27. Thus, any pronouncement we might make on the issue would be advisory, " * * * and it is well-settled that this court does not indulge itself in advisory opinions." *Armco, Inc. v. Pub. Util. Comm.* (1982), 69 Ohio St.2d 401, 406, 23 O.O.3d 361, 365, 433 N.E.2d 923, 926.

HOLMES, J., concurring and dissenting in part. I concur in the majority's finding R.C. 2305.27 constitutional and regarding application of the collateral source rule to future payments. I also agree with the conclusion of the majority that R.C. 2307.43 is not constitutionally defective upon an equal protection analysis. However, I must dissent from the majority in its holding that this section which provides caps for general damages in medical malpractice actions is unconstitutional on the basis that it violates Section 16, Article I of the Ohio Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

In that a great deal has been written in case law and in legal commentary, both in upholding, as well as in rejecting, the constitutionality of statutory limitations on medical malpractice recoveries, I shall not add at length to this plethora of legal analysis.

The first general principle which this court must adhere to in this, or in any other, legal review of the constitutionality of a legislative enactment is the firmly established rule that legislative acts enjoy a strong presumption of constitutionality and that any doubts must be resolved in favor of the statute. *Sedar v. Knowlton Constr. Co.* (1990), 49 Ohio St.3d 193, 199, 551 N.E.2d 938, 944; *State v. Stambaugh* (1987), 34 Ohio St.3d 34, 35, 517 N.E.2d 526, 527; *State v. Dorso* (1983), 4 Ohio St.3d 60, 61, 4 OBR 150, 151, 446 N.E.2d 449, 450; *State, ex rel. Dickman, v. Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, paragraph one of the syllabus; see, also, *State v. Sinito* (1975), 43 Ohio St.2d 98, 101, 72 O.O.2d 54, 56, 330 N.E.2d 896, 898; *Wilson v. Kennedy* (1949), 151 Ohio St. 485, 492, 39 O.O. 301, 304, 86 N.E.2d 722, 725. Although the majority seems to acknowledge this standard of constitutional review, it proceeds to give it little heed.

Applying such presumption of legality to the statute under consideration here, and applying the other appropriate standards of constitutional review, it is my opinion that R.C. 2307.43 violates neither the Ohio nor the United States Constitution regarding either equal protection or due process rights.

It must be emphasized that this limiting section involves *only* general, noneconomic damages, and *not* special, economic damages. The damages that *are* limited to $200,000 are those of a nonpecuniary harm alleged to have resulted from injury, such as pain and suffering, loss of society, companionship, mental anguish, etc. The damages that are *not* limited are those of a pecuniary harm such as all wages, salaries, or other compensation lost as a result of the injury; all expenditures for medical care or treatment, rehabilitation services, or other care, treatment, products or accommodations needed by virtue of the injury; or any other expenditures incurred as a result of the injury. Therefore, R.C. 2307.43 does not limit in any way a plaintiff's right to fully recover the economic damages caused by medical malpractice. Also, this section does not limit in any way the plaintiff's right to fully recover all damages, both economic and noneconomic, in cases involving death, including the survivor's mental anguish. Also this section does not, as suggested by some detractors, eliminate the recovery of general or noneconomic damages— such damages may be recovered up to the maximum of $200,000.

It is claimed by the petitioners that R.C. 2307.43 violates the state and federal constitutional provisions providing for due process and equal protection. In review of statutes challenged on constitutional grounds, this court applies a rational basis test as the standard of review. Applying this standard, the statute should be upheld absent proof of arbitrariness, irrationality or unreasonableness of the legislature. Accordingly, in *Strock v. Pressnell* (1988), 38 Ohio St.3d 207, 214, 527 N.E.2d 1235, 1241, this court held that the legislature could, as here, make modifications to the common law as long as the legislature (1) does not interfere with vested property rights and (2) has a permissible legislative objective.

In *Strock* this court acknowledged that the General Assembly may limit, modify or abolish common law causes of action, stating: " '*A person has no property, no vested interest, in any rule of the common law.* * * * Rights of property which have been created by the common law cannot be taken away without due process; *but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature,* unless prevented by constitutional limitations. *Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances.*' *Munn v. Illinois* (1876), 94 U.S.

113, 134 [24 L.Ed. 77, 87]; *Second Employers' Liability Cases* (1912), 223 U.S. 1, 50 [32 S.Ct. 169, 175, 56 L.Ed. 327, 346]; see *Western Union Tel. Co. v. Commercial Milling Co.* (1910), 218 U.S. 406, 416–417 [31 S.Ct. 59, 61–62, 54 L.Ed. 1088, 1091–1092]." (Emphasis added.) *Strock, supra,* 38 Ohio St.3d at 213–214, 527 N.E.2d at 1241.

R.C. 2307.43 does not violate Section 16, Article I of the Ohio Constitution. This section is a limitation on the recovery of noneconomic damages in a common-law cause of action. This limitation does not interfere with a vested property right.

Further, this limitation on noneconomic recoveries in medical malpractice civil actions has a reasonably permissible legislative objective. In this regard we may look to *Beatty v. Akron City Hospital* (1981), 67 Ohio St.2d 483, 495, 21 O.O.3d 302, 309, 424 N.E.2d 586, 594, where it was stated: "The Ohio General Assembly, after appropriate study and debate on the subject, recognized the urgency of implementing a reasonable and effective means of helping alleviate the adverse economic and social impacts of this medical provider crisis. *It is beyond reasonable question that the General Assembly had a legitimate interest in protecting the health of its citizens as well as the economic and social stability of the state in this area of concern.* Concluding as they must have that the increased number of medical claims was the cause of the dramatic rise in the cost of medical malpractice insurance, and thus the cause of the rise in the cost of providing medical services to the public, *it was only rational for the General Assembly to deal with such claims in the manner provided in the Act.*" (Emphasis added.)

The legislative determination of the medical malpractice crisis was based upon reports and analyses of evidence and upon criteria developed both in Ohio and throughout the United States. The General Assembly had evidence presented to the committees that liability insurance premiums for health care professionals escalated at a significant rate during the 1960s and 1970s. From 1960 to 1970 surgeons' premiums rose 949.2 percent and nonsurgeons' premiums rose 540.8 percent.[9] Over the same period hospital insurance costs jumped 262.7 percent.[10] Predominant among the reasons for such increases were the rising frequency of medical malpractice suits and the upward

---

9. U.S. Dept. of Health, Educ. & Welfare, Pub. No. (OS) 73–88, Medical Malpractice: Report of the Secretary's Commission on Medical Malpractice 13 (1973) (hereinafter "HEW Report"), cited in Redish, Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications (1977), 55 Tex.L.Rev. 759.

10. HEW Report, *supra,* at 13, cited in Redish, *supra,* at 759–760.

spiraling damage award typical of such claims.[11] Medical insurers responded to these events by adjusting their ratemaking tables to reflect the upward climb in payout costs [12] and in some instances by abandoning the medical market altogether.[13] As insurance premiums rose, physicians and hospitals developed methods to minimize the risk of malpractice suits and avoid the resulting higher premiums. Some of these methods included the avoidance of high-risk medical specialties, relocation to lower-risk geographic areas, practice of defensive medicine [14] through the increasing use of secondary and follow-up procedures, and shift of increases in insurance costs to patients.[15] But each of these defensive actions represented a potential threat to those requiring medical care and services. As the situation worsened, concerned commentators and legislators labeled it the medical malpractice "crisis." [16]

This majority should reasonably conclude that R.C. 2307.43 bears a direct relationship to this recognized purpose of the legislation passed in response to the medical malpractice crisis, as was determined after appropriate hearings and review of the evidence by the legislature. By placing a ceiling on the recovery of noneconomic damages in medical claims, the legislature determined that it could relieve the effects of unpredictably large jury verdicts. The legislature also concluded that under this Act, physicians and their professional liability insurers would be better able to predict their potential

11. HEW Report, *supra*, at 41, cited in Legislation Notes, Ohio's Attempts to Halt the Medical Malpractice Crisis: Effective or Meaningless? (1984), 9 Univ. Dayton L.Rev. 361 (hereinafter "Notes"); Redish, *supra*, at 760–761. Approximately 55 to 86 percent of the insurance premium is attributable to adjustments reflecting increases in losses sustained by the insurer. HEW Report, *supra*, at 41–42, cited in Notes, *supra*, at 361.

12. HEW Report, *supra*, at 41–42, cited in Notes, *supra*, at 361.

13. Buckeye Union Insurance Inc., one of Ohio's largest medical insurers, left the medical market. PICO: Just what doctors ordered, Columbus Dispatch, May 8, 1983, at H1, col. 3.

14. " '[D]efensive Medicine is the alteration of modes of medical practice, induced by the threat of liability, for the principal purposes of forestalling the possibility of lawsuits by patients as well as providing a good legal defense in the event such lawsuits are instituted.' " HEW Report, *supra*, 1, at 14, cited in Notes, *supra*, at 361, fn. 6.

15. HEW Report, *supra*, at 12–13, cited in Redish, *supra*, at 760. "Doctors' fees rise by 9.1 percent for every 100 percent increase in doctors' premiums when these premiums represent only about 4 percent of total costs, and hospital prices rise by 8.9 percent for every 100 percent increase in hospital premiums when these premiums represent less than 1 percent of total costs * * *." Greenwald & Mueller, Medical Malpractice and Medical Costs, in The Economics of Medical Malpractice (Rottenberg Ed.1978) 65, 82.

16. H.B. No. 682, 111th Ohio General Assembly, 1st Reg.Sess., 136 House Journal, Part I, 687 (1975), description of bill; Medical Association Predicts That Health Care Crisis Imminent in Ohio, Gongwer News Serv., Inc., Ohio Report, July 1, 1975, at 3, cited in Notes, *supra*, at 362.

exposure which in turn bears directly on the amount of premiums necessary to provide adequate and secure professional liability insurance. Thus, these were the bases for the reasonable legislative enactment of medical malpractice legislation with the contested cap for recovery of noneconomic damages. As Judge Contie of the federal district court found in *Keeton v. Mansfield Obstetrics & Gynecology Assoc., Inc.* (N.D.Ohio 1981), No. C–80–1573A, unreported, the inquiry is not whether any judge who hears this issue would have voted for this legislation as a legislator. The wisdom of the statute is not the determinative issue. Rather, the inquiry is whether the classification rests on grounds that are reasonably related to the achievement of the state's objective. In *Keeton*, Judge Contie, although having some personal hesitation on the question, held that R.C. 2307.43 did not violate equal protection and stated:

"The general rationality that smaller damage awards will stabilize the cost of malpractice insurance and guarantee health care throughout the state are [*sic*] ample justification for the difference in treatment between medical malpractice plaintiffs and other tort plaintiffs and among medical malpractice plaintiffs." *Id.* at 29.

There has been a difference of opinion among the various courts throughout the United States as to the constitutionality of legislative caps being placed upon medical malpractice damage recoveries by states' legislative bodies. The majority points out that most of the jurisdictions that have addressed the subject have proclaimed such caps to be unconstitutional under state or federal analyses. However, it should be pointed out that some of the authority cited in support of the proposition that the caps are unconstitutional has originated in states where such caps have been placed upon overall damages—both economic as well as noneconomic. Moreover, state supreme courts from several jurisdictions have found caps upon either noneconomic or economic damages in medical malpractice actions to be constitutional.[17] Nota-

---

17. The following jurisdictions have upheld caps on either general or economic damages, or both, in malpractice actions: *Etheridge v. Medical Ctr. Hospitals* (1989), 237 Va. 87, 376 S.E.2d 525; *Williams v. Kushner* (La.1989), 549 So.2d 294; *Fein v. Permanente Medical Group* (1985), 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665, appeal dismissed (1985), 474 U.S. 892, 106 S.Ct. 214, 88 L.Ed.2d 215 (White, J., dissenting); *Johnson v. St. Vincent Hosp., Inc.* (1980), 273 Ind. 374, 404 N.E.2d 585; *Prendergast v. Nelson* (1977), 199 Neb. 97, 256 N.W.2d 657; see, also, *Samsel v. Wheeler Transport Services, Inc.* (1990), 246 Kan. 336, 361–362, 789 P.2d 541, 557–558 (distinguished *Kansas Malpractice Victims Coalition v. Bell* [1988], 243 Kan. 333, 757 P.2d 251, and upheld the constitutionality of a $250,000 cap on noneconomic losses since the underlying statute provided a *quid pro quo* in that the court was prohibited from exercising its discretion to award less than the cap when higher damages were awarded by a jury); *Franklin v. Mazda Motor Corp.* (D.Md.1989), 704 F.Supp. 1325 (federal district court interpreting Maryland and United States constitutional provisions upheld a $350,000 cap on noneconomic

ble among the latter holdings is *Fein v. Permanente Medical Group* (1985), 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665, where the California Supreme Court upheld the California statute limiting recovery of noneconomic damages to $250,000. The United States Supreme Court dismissed the appeal of this case for lack of a substantial constitutional question. See (1985), 474 U.S. 892, 106 S.Ct. 214, 88 L.Ed.2d 215. In *Fein* the majority, in supporting the legislative cap, stated that: "Faced with the prospect that, in the absence of some cost reduction, medical malpractice plaintiffs might as a realistic matter have difficulty collecting judgments for *any* of their damages—pecuniary as well as nonpecuniary—the Legislature concluded that it was in the public interest to attempt to obtain some cost savings by limiting noneconomic damages. Although reasonable persons can certainly disagree as to the wisdom of this provision, we cannot say that it is not rationally related to a legitimate state interest." (Footnotes omitted.) *Id.*, 38 Cal.3d at 160–161, 211 Cal.Rptr. at 384–385, 695 P.2d at 681.

I agree with this statement of the California majority, and would apply such an analysis to the Ohio statute placing a limitation upon noneconomic damages.

In that I disagree with the majority with respect to its due process analysis, I would hold R.C. 2307.43 constitutional.

SWEENEY, J., concurring in part and dissenting in part. I agree with the majority that R.C. 2307.43 violates the Due Process Clause of the Ohio Constitution, but, respectfully, I disagree with much of what the majority does here today. I write separately because, in my view, R.C. 2307.43 violates *several* provisions of the Ohio Constitution (including the Due Process Clause) and, further, because I believe that R.C. 2305.27 is, among other things, unconstitutional.

## I

### R.C. 2307.43

In the case at bar, we are asked to decide whether R.C. 2307.43 violates the Ohio Constitution. R.C. 2307.43 provides that:

---

damages in personal injury awards citing the fact that individuals had no vested interest in any rule of common law; therefore, the cap did not violate the right to a jury trial. And, under state and federal due process scrutiny the cap bore a reasonable relation to a valid legislative purpose); *Boyd v. Bulala* (C.A.4, 1989), 877 F.2d 1191, 1195–1197 (federal court of appeals citing *Etheridge, supra,* as dispositive of challenges made under state constitution to Virginia's cap on medical malpractice damages and finding no violation of the Seventh Amendment to the United States Constitution in that the " * * * legislature may completely abolish a cause of action without violating the right of trial by jury, * * * [and] it permissibly may limit damages recoverable for a cause of action as well," *id.* at 1196).

"In no event shall an amount recovered for general damages in any medical claim, as defined in division (D) of section 2305.11 of the Revised Code, not involving death exceed the sum of two hundred thousand dollars."

R.C. 2305.11(D)(3) defines a "medical claim" as follows:

" 'Medical claim' means any claim that is asserted in any civil action against a physician, podiatrist, or hospital, against any employee or agent of a physician, podiatrist, or hospital, or against a registered nurse or physical therapist, and that arises out of the medical diagnosis, care, or treatment of any person. 'Medical claim' includes derivative claims for relief that arise from the medical diagnosis, care, or treatment of a person."

For the following reasons, I believe that R.C. 2307.43 is unconstitutional.

## A

### Jury Trials

The right to jury trial derives from the Magna Carta, and is reasserted in both the United States and Ohio Constitutions. For centuries, the right to a jury trial has been held to be a fundamental constitutional right. See *Cleveland Ry. Co. v. Halliday* (1933), 127 Ohio St. 278, 284, 188 N.E. 1, 3. The right, where it exists, is substantive, not procedural. *Kneisley v. Lattimer–Stevens Co.* (1988), 40 Ohio St.3d 354, 356, 533 N.E.2d 743, 746.

The Ohio Constitution recognizes the fundamental right to a jury trial in Section 5, Article I, which provides that:

"The right of trial by jury shall be *inviolate,* except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury." (Emphasis added.)

However, Section 5, Article I does not guarantee the right to a jury trial in all cases. Section 5, Article I only preserves the right to a jury trial with respect to those causes of action where the right existed at common law at the time our state Constitution was adopted. See *Belding v. State, ex rel. Heifner* (1929), 121 Ohio St. 393, 169 N.E. 301, paragraph one of the syllabus.

The action for negligence, upon which today's medical malpractice actions are founded, evolved from the common law action of "trespass on the case." See *Mominee v. Scherbarth* (1986), 28 Ohio St.3d 270, 291, 28 OBR 346, 364, 503 N.E.2d 717, 733 (Douglas, J., concurring). At common law, in trespass actions, the right to trial by jury was recognized. See, generally, 47 American Jurisprudence 2d (1969) 657–658, Jury, Section 39; and *Kneisley, supra,* 40 Ohio St.3d at 356–357, 533 N.E.2d at 746. Furthermore, this court has, on a previous occasion, determined that the right to a jury trial in trespass actions existed in Ohio at "common law" at the time of the adoption of our state

Constitution. *Kneisley, supra,* at 357, 533 N.E.2d at 746. Thus, the right to a jury trial in today's medical malpractice actions is guaranteed by Section 5, Article I of the Ohio Constitution.

In the case at bar, plaintiff-petitioner, Ralph Morris, was the victim of defendant-respondent Dr. John A. Savoy's medical malpractice. Morris and his wife sued Savoy, and Savoy admitted liability. The case was tried to a jury on the issue of damages and the jury returned a verdict awarding Morris and his wife over $2,200,000 in damages. However, R.C. 2307.43 places a "cap" on general, or noneconomic, damages and if applied in the case at bar, the amount of the jury's award representing general damages would be reduced to $200,000. This would result in a *reduction* of the jury's award of $771,000.[18]

As we have seen, Section 5, Article I of the Ohio Constitution guarantees the right to trial by jury in medical malpractice cases and provides that the right " * * * shall be inviolate * * *." "Inviolate" means " * * * free from substantial impairment." Black's Law Dictionary (6 Ed.1990) 826. Applying R.C. 2307.43 to reduce any portion of a jury's award in the case at bar would clearly infringe upon the jury's function to determine damages and to provide a remedy which would compensate Morris and his wife for the injuries suffered by them. Applying R.C. 2307.43 would substitute the will of the General Assembly for that of the jury in any case where a jury awards general damages for medical malpractice in excess of $200,000. In my view, *any* application of R.C. 2307.43 "substantially impairs" the right to a trial by jury and substantially erodes that sacred and fundamental constitutional right.

It may be argued that R.C. 2307.43 does not substantially impair the right to a jury trial but, rather, merely limits the amount of general damages recoverable in a medical malpractice case. This argument, however, is not persuasive. The right to trial by jury includes the right to have the jury determine factual issues *and assess damages. Miller v. Wikel Mfg. Co.* (1989), 46 Ohio St.3d 76, 81, 545 N.E.2d 76, 81 (Douglas, J., concurring in part and dissenting in part). See, also, *Seth v. Capitol Paper Co.* (Aug. 29, 1990), Montgomery App. No. 11539, unreported, 1990 WL 125724. The right to a jury trial is a substantive (and not a procedural) right. *Kneisley, supra,* 40 Ohio St.3d at 356, 533 N.E.2d at 746. Hence, the right to a jury trial must not be viewed as a mere perfunctory exercise. This is particularly true given the clear mandate of Section 5, Article I.

---

18. The jury awarded $845,000 for pain and suffering, and $126,000 for loss of consortium and services. Thus, these "general" (or noneconomic) damages would be "capped" at $200,000, resulting in a $771,000 reduction of the award.

Several courts from other jurisdictions which have carefully considered the question concerning caps on damages have concluded that the limitation on damages violates the right to jury trial provision of their respective state constitutions. See, *e.g.*, *Sofie v. Fibreboard Corp.* (1989), 112 Wash.2d 636, 771 P.2d 711; *Smith v. Dept. of Ins.* (Fla.1987), 507 So.2d 1080; and *Kansas Malpractice Victims Coalition v. Bell* (1988), 243 Kan. 333, 757 P.2d 251.[19] Of particular interest is the fact that Washington, Florida and Kansas have constitutional provisions stating (in one form or another) that the right to trial by jury shall be "inviolate." See Section 21, Article I of the Washington Constitution; Section 22, Article I of the Florida Constitution; and Section 5 of the Kansas Constitution Bill of Rights. See, also, *Arneson v. Olson* (N.D.1978), 270 N.W.2d 125.

The right to trial by jury is one of the touchstones of the founding of our nation. As stated by Justice Andy Douglas in his concurring and dissenting opinion in *Miller, supra:*

"It is no accident that the Seventh Amendment to the United States Constitution provides: 'In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved * * *.' It is no accident that Section 5, Article I of the Ohio Constitution provides: 'The right of trial by jury shall be inviolate * * *.'

"The long and storied history of the right, in America, to trial by jury dates as far back as 1606 when certain matters in Virginia were tried before juries. Massachusetts, New Jersey and Pennsylvania followed with documents providing for trial by jury. The First Continental Congress declared in 1774 that the colonists were entitled to be tried by a jury of peers of the vicinage—and John Hancock and his brave friends, in signing the Declaration of Independence thereby absolving the colonies from all allegiance to the British Crown, set forth, as one of their grievances, the ' * * * depriving us in many cases, of benefits of Trial by Jury * * *.'

"The right to trial by jury was provided for in state constitutions, both before and after the drafting and adoption of the federal Constitution. The fact that the original federal Constitution did not contain a provision regarding the right to trial by jury caused persons like Thomas Jefferson and Patrick Henry to indicate they would oppose ratification. Alexander Hamilton attempted to answer the criticism in Federalist No. 83, but Jefferson supported ratification only when James Madison agreed to introduce in the First Congress a Bill of Rights including a provision or amendment for trial by jury. It is not surprising that Jefferson expressed his feelings on the subject by

---

19. Compare *Samsel v. Wheeler Transport Services* (1990), 246 Kan. 336, 789 P.2d 541.

saying: 'I consider trial by jury as the only anchor ever yet imagined by man by which a government can be held to the principles of the Constitution.' " (Footnote omitted.) *Id.,* 46 Ohio St.3d at 81–82, 545 N.E.2d at 82.

Since R.C. 2307.43 encroaches upon the right to trial by jury, it clearly violates Section 5, Article I of the Ohio Constitution.

## B

### Due Process

The majority concludes that R.C. 2307.43 violates the Due Process Clause of the Ohio Constitution (Section 16, Article I). While I agree that R.C. 2307.43 violates due process, I do not agree with some of the majority's discussion leading to that conclusion. Specifically, I disagree that our standard for reviewing R.C. 2307.43 is the same standard employed by this court in *Mominee, supra,* and *Schwan v. Riverside Methodist Hosp.* (1983), 6 Ohio St.3d 300, 6 OBR 361, 452 N.E.2d 1337.

Section 16, Article I of the Ohio Constitution provides, in part, as follows:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. * * * "

Section 16, Article I guarantees, among other things,[20] that an individual who suffers an injury to his or her person has the right to a remedy by *due course* of law. The "due course of law" provision of Section 16, Article I is considered the equivalent of the "due process of law" provision in the Fourteenth Amendment to the United States Constitution. *Direct Plumbing Supply Co. v. Dayton* (1941), 138 Ohio St. 540, 544, 21 O.O. 422, 424, 38 N.E.2d 70, 72.

According to the principles of due process, governmental actions which limit the exercise of "fundamental" constitutional rights are subject to the highest level of judicial scrutiny. See, *e.g., N.A.A.C.P. v. Alabama, ex rel. Patterson* (1958), 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488. Under this "strict scrutiny" standard for reviewing legislation which restricts the exercise of fundamental rights, a statute will be considered unconstitutional unless it is shown to be necessary to promote a compelling governmental interest. See *Shapiro v. Thompson* (1969), 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600, 615; and *Primes v. Tyler* (1975), 43 Ohio St.2d 195, 198–199, 72 O.O.2d 112, 114, 331 N.E.2d 723, 726.

---

**20.** See discussion, *infra,* at Part I(D).

As mentioned before, the right to a jury trial in medical malpractice actions is a fundamental right guaranteed by Section 5, Article I of the Ohio Constitution. See discussion in Part I(A), *supra.* Therefore, to determine whether R.C. 2307.43 (which restricts the right of trial by jury) violates the Due Process Clause of the Ohio Constitution, a "strict-scrutiny" standard of review applies. As such, in my view, the majority clearly errs in finding that the same standard of review to determine whether R.C. 2307.43 violates due process is the one employed by this court in *Mominee, supra,* and *Schwan, supra.*

However, the majority does conclude that R.C. 2307.43 violates the Due Process Clause because " * * * it does not bear a real and substantial relation to public health or welfare and further because it is unreasonable and arbitrary." I agree. R.C. 2307.43 violates Section 16, Article I even if it is reviewed under the permissive standard employed by today's majority. The Supreme Courts of both Texas and Kansas have reached similar conclusions finding that a cap on medical malpractice damages violates the "due course of law" provision of their respective state constitutions. See *Lucas v. United States* (Tex.1988), 757 S.W.2d 687, and *Kansas Malpractice Victims Coalition, supra.*

C

Equal Protection

R.C. 2307.43, in addressing the issue of medical malpractice, creates a classification of individuals comprised of all medical malpractice victims. As the majority ably points out, R.C. 2307.43 treats individual members of this classification in radically different ways. For instance, the statute treats those within the class who are most seriously injured by medical malpractice differently from those who are not as seriously injured. However, all individuals who are *affected* by the statute (those with general damages exceeding $200,000) are deprived of the fundamental constitutional right to trial by jury. See discussion in Part I(A), *supra.* Therefore, the statutory classification "involves" a fundamental right.

A statutory classification which involves neither a suspect class *nor a fundamental right* does not violate the Equal Protection Clause of the Ohio Constitution if the classification is rationally related to a legitimate governmental interest. See *Kinney v. Kaiser Aluminum & Chemical Corp.* (1975), 41 Ohio St.2d 120, 123, 70 O.O.2d 206, 208, 322 N.E.2d 880, 883. See, also, *Klepper v. Ohio Bd. of Regents* (1991), 59 Ohio St.3d 131, 570 N.E.2d 1124. Today's majority finds that R.C. 2307.43 involves neither a suspect class nor a fundamental right and, hence, applies a "rational basis" standard to review

the constitutionality of R.C. 2307.43. Clearly the majority errs in applying this standard of review.

The correct standard to employ in determining whether a statutory classification involving a fundamental right violates the Equal Protection Clause of the Ohio Constitution is the "strict-scrutiny" test. See *Shapiro, supra.*[21] Thus, R.C. 2307.43 is unconstitutional unless it can be shown that the statute is necessary to promote a compelling governmental interest. *Id.* The majority concedes that the statutory classifications created by R.C. 2307.43 are barely supported even under a "rational basis" standard of review. Certainly, it cannot be said that R.C. 2307.43 is necessary to promote a compelling governmental interest.

Furthermore, the majority's citation to *Denicola v. Providence Hosp.* (1979), 57 Ohio St.2d 115, 11 O.O.3d 290, 387 N.E.2d 231, does not support the proposition that a rational basis standard of review is applicable in the case at bar. The statute upheld in *Denicola* (qualifications of expert witnesses) did not involve a fundamental right, whereas R.C. 2703.43 clearly involves the right to trial by jury.

However, even if the "rational basis" test is the appropriate standard of review herein, I believe that the majority's conclusion that R.C. 2307.43 does not violate the Equal Protection Clause of the Ohio Constitution is unsupportable.

In its due process analysis, the majority concludes that there is no evidence to show that the R.C. 2307.43 cap on medical malpractice damages is rationally related to the achievement of the state's objective to reduce medical malpractice insurance rates. How then can the majority conclude, in its equal protection analysis, that the statutory classification created by R.C. 2307.43 rationally furthers a legitimate legislative objective where there is admittedly no evidence to support that conclusion? Further, in its due process analysis, the majority concludes that R.C. 2307.43 is unreasonable and arbitrary. How then can the majority say, in its equal protection analysis, that R.C. 2307.43 "rationally" furthers a legitimate governmental interest?

The answer to these questions is that the majority cannot reasonably conclude that R.C. 2307.43 violates due process on the one hand but does not violate equal protection on the other hand. It is *literally* "hornbook" law that the analyses for due process and equal protection are identical, and that the only substantial difference between substantive due process and equal protec-

---

21. The limitations placed upon governmental action by the Equal Protection Clauses of the Ohio and United States Constitutions are nearly identical. See *Kinney v. Kaiser Aluminum & Chemical Corp.* (1975), 41 Ohio St.2d 120, 123, 70 O.O.2d 206, 207–208, 322 N.E.2d 880, 882.

tion is that legislation reviewed under equal protection always involves a classification. Nowak, Rotunda & Young, Constitutional Law (3 Ed.1986) at 329 and 350–351, Sections 10.7 and 11.4.

Additionally, several state supreme courts have held that a statutory cap on medical malpractice damages violates the equal protection clause(s) of the respective states' constitutions. See, e.g., *Carson v. Maurer* (1980), 120 N.H. 925, 424 A.2d 825; *Wright v. Central Du Page Hosp. Assn.* (1976), 63 Ill.2d 313, 347 N.E.2d 736; and *Arneson, supra.* In my view, Ohio should now join the ranks of these enlightened jurisdictions.

## D

### Open Courts

Section 16, Article I of the Ohio Constitution, in addition to providing for a right to remedy by "due course of law," [22] provides that "[a]ll courts shall be open * * *." Section 16, Article I ensures that the courts shall be open for actions based upon medical malpractice.

In *Smith, supra,* the Supreme Court of Florida determined that a $450,000 "tort-reform" cap on damages violates Section 21, Article I (the "open courts" or "access to courts" provision) of the Florida Constitution.[23] In doing so, the court stated that:

"Appellees also argue, and the trial court below agreed, that the legislature has not totally abolished a cause of action, it has only placed a cap on damages which may be recovered and, therefore, has not denied the right to access the courts. This reasoning focuses on the title to article I, section 21, 'Access to courts,' and overlooks the contents which must be read in conjunction with section 22, 'Trial by jury.' Access to courts is granted for the purpose of redressing injuries. A plaintiff who receives a jury verdict for, e.g., $1,000,000, has not received a constitutional redress of injuries if the legislature statutorily, and arbitrarily, caps the recovery at $450,000. Nor, we add, because the jury verdict is being arbitrarily capped, is the plaintiff receiving the constitutional benefit of a jury trial as we have heretofore understood that right. Further, if the legislature may constitutionally cap recovery at $450,000, there is no discernible reason why it could not cap the recovery at some other figure, perhaps $50,000, or $1,000, or even $1. None of these caps, under the reasoning of appellees, would 'totally' abolish the

---

22. See discussion in Part I(B), *supra.*

23. Section 21, Article I of the Florida Constitution is similar to Clause 1, Section 16, Article I of the Ohio Constitution.

right of access to the courts. At least one of the appellees candidly argues that there is no constitutional bar to completely abolishing noneconomic damages by requiring potential injured victims to buy insurance protecting themselves against economic loss due to injury as an alternative remedy. That particular issue is not before us but we note that if it were permissible to restrict the constitutional right by legislative action, * * * the constitutional right of access to the courts for redress of injuries would be subordinated to, and a creature of, legislative grace or, as Mr. Smith puts it, 'majoritarian whim.' There are political systems where constitutional rights are subordinated to the power of the executive or legislative branches, but ours is not such a system." *Id.* at 1088–1089.

I agree with the court in *Smith* that a statutory cap on damages violates the constitutional right to open courts. The Texas Supreme Court is in accord. *Lucas, supra.*

While R.C. 2307.43 does not completely abolish the right to open courts for a victim of medical malpractice, the effect of the legislation strikes at the very heart of the reason why the courts are to remain open, to wit: to permit individuals to obtain satisfaction for injury or damage sustained. In my view, Section 16, Article I not only protects the right to file a lawsuit, but also protects the right to a judgment (or verdict) which is properly rendered in the suit since, after all, it is the obtaining of damages which truly counts. To allow the General Assembly to encroach upon the right to obtain redress of injuries is to subordinate a constitutional right to the will of the General Assembly. This court should not abdicate its responsibility while constitutional rights are whittled away and supplanted by unconstitutional legislation. Accordingly, I would hold that R.C. 2307.43 violates the "open courts" provision of the Ohio Constitution.

E

Special Privileges

Section 2, Article I of the Ohio Constitution provides, in part, that " * * * no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the general assembly."

R.C. 2307.43 limits (without a rational justification) the liability of a particular class of tortfeasors at the expense, and to the detriment, of their victims who suffer extensive injuries. The class of tortfeasors protected by R.C. 2307.43 is granted this benefit while other tortfeasors are not. Section 2, Article I of the Ohio Constitution prohibits such special treatment and such grants of immunity. See *Primes, supra* (Ohio's "guest statute," R.C. 4515.-02, found unconstitutional because, *inter alia*, it denied the people of Ohio

equal protection and benefit of the law by granting a special privilege and immunity to a certain class of tortfeasors). See, also, *Wright, supra* (Illinois Supreme Court held that legislation limiting recovery in malpractice actions to $500,000 violated Section 13, Article IV of the Illinois Constitution which prohibits enactment of "special laws." *Id.,* 63 Ill.2d at 329–330, 347 N.E.2d at 743).

In my view, R.C. 2307.43 violates Section 2, Article I, prohibiting the granting of special privileges and immunities.

## II

### R.C. 2305.27

We are also asked, in the case before us, to decide whether R.C. 2305.27 violates the Ohio Constitution. R.C. 2305.27 provides that:

"Except as provided in section 2743.02 of the Revised Code, in any medical claim, as defined in division (D) of section 2305.11 of the Revised Code, an award of damages shall not be reduced by insurance proceeds or payments or other benefits paid under any insurance policy or contract where the premium or cost of such insurance policy or contract was paid either by or for the person who has obtained the award, or by his employer, or both, or by direct payments from his employer, *but shall be reduced by any other collateral recovery for medical and hospital care, custodial care or rehabilitation services, and loss of earned income.* Unless otherwise expressly provided by statute, a collateral source of indemnity shall not be subrogated to the claimant against a physician, podiatrist, or hospital." (Emphasis added.)

Prior to the enactment of R.C. 2305.27, Ohio followed the "collateral source rule," whereby a plaintiff could receive full damages against a defendant-wrongdoer regardless of whether the plaintiff received reparations for his or her injury from a collateral source, *i.e.,* from a source other than from the defendant. *Pryor v. Webber* (1970), 23 Ohio St.2d 104, 107–108, 52 O.O.2d 395, 397, 263 N.E.2d 235, 238. However, R.C. 2305.27 partially abrogates the collateral source rule by permitting negligent medical providers to have credited to their benefit certain collateral recoveries which inure to their victims.

The majority concludes that R.C. 2305.27 is constitutional. I disagree for the reasons which follow.

### A

### Jury Trials—Open Courts

R.C. 2305.27 and 2307.43 violate the fundamental right to trial by jury and the "open courts" provision of the Ohio Constitution for substantially similar

reasons. Hence, I incorporate my previous discussion in Parts I(A) and (D) herein where applicable.

R.C. 2305.27 requires that an award rendered in a medical malpractice case must be reduced by certain collateral sources of recovery. Thus, for any victim of medical malpractice who pursues his or her claim, R.C. 2305.27 may operate to reduce the amount of the jury award (assuming the matter is tried to a jury) and, therefore, the statute impairs the right to trial by jury—a right which must be jealously protected—and strikes at the very heart of the "open courts" provision of the Ohio Constitution. Indeed, it is conceivable that collateral source recovery may be so substantial in a given case that application of R.C. 2305.27 could result in a reduction of an entire jury award. In such a case, the tortfeasor guilty of medical malpractice would receive a complete "rebate" for the damages he or she caused, and the victim's rights (to a jury trial and to open courts) would be rights hardly worth exercising.

Additionally, perhaps certain victims of medical malpractice may realize that R.C. 2305.27 has the potential to render their trip to court an exercise in futility (depending upon the victim's sources of collateral recovery) and decide that pursuing a claim is not worth the time and expense involved. For these victims of medical malpractice, the right to a jury trial (and to open courts) will never be realized because of the partial abrogation of the collateral source rule.

Accordingly, I would hold that R.C. 2305.27 violates Section 5, Article I and Section 16, Article I, of the Ohio Constitution.

### B

### Equal Protection—Due Process

R.C. 2305.27, in partially abrogating the collateral source rule in medical malpractice cases, creates a classification of individuals comprised of all medical malpractice victims. However, R.C. 2305.27 (like 2307.43) treats members of this classification differently. For instance, members of the classification who own insurance policies paid for by themselves or by their employers do not have their insurance benefits set off against a damage award. However, members of the classification who recover from any other collateral source may suffer a reduction of their award.

A statutory classification which involves a fundamental right violates the Equal Protection Clause of the Ohio Constitution if the classification is not necessary to promote a compelling governmental interest. See discussion in Part I(C), *supra*. R.C. 2305.27 involves a fundamental right. See discussion in Part II(A), *supra*. The majority, in upholding R.C. 2305.27, determines that

the purpose of the statute is to limit double recovery. However, limiting double recovery in medical malpractice cases (and then only with regard to certain sources of collateral recovery) is not *necessary* to promote a *compelling* governmental interest particularly where, as here, the statutory classification is established in response to a "crisis" which is yet to be shown to exist.

In *Carson, supra,* the Supreme Court of New Hampshire determined that a statute modifying the collateral source rule in cases involving medical injuries violated the Equal Protection Clauses of the state's Constitution. The court reached this conclusion even though it was determined that the statute eliminated some duplicate recovery and although the collateral source rule operates so as to place some plaintiffs in a better financial position than before the wrong. In this regard, the court found that abolishing the collateral source rule results in a "windfall" to the defendant tortfeasor or the tortfeasor's insurer and that the cost of abolishing the collateral source rule to many medical malpractice plaintiffs is "simply too high" to justify. *Id.,* 120 N.H. at 940–941, 424 A.2d at 835–836.

Today's majority upholds R.C. 2305.27 to, in effect, prohibit a windfall for certain victims of medical malpractice. However, as *Carson* indicates, abolishing the collateral source rule in medical malpractice cases works to the benefit (*i.e.,* grants a windfall) of the defendant tortfeasor or the tortfeasor's insurer at the expense of certain victims of medical malpractice. While it may be the intended purpose of R.C. 2305.27 to limit double recovery, it does so at the expense of members of the general public who fall victim to medical malpractice. In my view, collateral sources received by a victim should inure to the benefit of the victim (not the tortfeasor), and there is no rationale (compelling or otherwise) which would support the proposition that as between the tortfeasor and his or her innocent victim, the tortfeasor should benefit from payments received by the victim from a collateral source. See *Grayson v. Williams* (C.A.10, 1958), 256 F.2d 61, 65.

Furthermore, a statutory classification violates the Equal Protection Clause of the Ohio Constitution if it treats similarly situated people in a dissimilar manner based upon an illogical and arbitrary basis. See *State v. Buckley* (1968), 16 Ohio St.2d 128, 45 O.O.2d 469, 243 N.E.2d 66, and *Klepper, supra.* In my view, treating medical malpractice victims differently based upon the source of their collateral recovery makes absolutely no sense whatsoever.

Accordingly, I believe that R.C. 2305.27 violates the Equal Protection Clause of the Ohio Constitution. Therefore, R.C. 2305.27 also violates the Due Process Clause of the Ohio Constitution.[24] See *Arneson, supra,* at 137 (near

---

24. See discussion in Part I(C), *supra.*

abolition of collateral source doctrine violates medical patient's due process rights).

## C

### Special Privileges

R.C. 2305.27 violates Section 2, Article I of the Ohio Constitution (prohibiting a grant of special privileges and immunities) for the reasons previously discussed in Part I(E), *supra*.

## III

### R.C. 2305.27 and Workers' Compensation

The majority holds that pursuant to R.C. 2305.27, future workers' compensation payments that Morris can reasonably expect to receive "can and should" be deducted from the jury's verdict awarding Morris $600,000 for future lost wages. I disagree. In my view, R.C. 2305.27 (in addition to being unconstitutional) clearly does not require and, indeed, prohibits reduction of an award of damages by any amounts paid under the workers' compensation system. Because the majority does not quote or even consider the portion of R.C. 2305.27 relevant to this determination, it would be helpful at this point to, once again, set forth the relevant portion of R.C. 2305.27:

"Except as provided in section 2743.02 of the Revised Code, in any medical claim, as defined in division (D) of section 2305.11 of the Revised Code, *an award of damages shall not be reduced by insurance proceeds or payments or other benefits paid under any insurance policy or contract where the premium or cost of such insurance policy or contract was paid either by or for the person who has obtained the award, or by his employer * * *.*" (Emphasis added.)

R.C. 2305.27 is unambiguous in prohibiting the reduction of an award of damages by any amounts paid under any insurance policy where the premium or cost of the policy is paid for by the employer of the person who obtains the award.

This court has long recognized that the workers' compensation laws are " * * * founded upon the principle of insurance * * *." See *State, ex rel. Crawford, v. Indus. Comm.* (1924), 110 Ohio St. 271, 274, 143 N.E. 574, 575. Indeed, this court has referred to workers' compensation as "workmen's compensation insurance." *Id.* at syllabus. See, also, *id.* at 276, 143 N.E. at

575. Throughout R.C. Chapter 4123,[25] the General Assembly uses terms such as "state insurance fund," "insurance fund," "self-insurers," "premiums," "coverage," and other similar terms and phrases consistent with the concept of insurance. Further, as this court indicated in *Blankenship v. Cincinnati Milacron Chemicals* (1982), 69 Ohio St.2d 608, 615, 23 O.O.3d 504, 509, 433 N.E.2d 572, 577, an employer who commits an "intentional tort" against his or her employee is not immune from liability simply because the employer complies with the workers' compensation laws since "[a]n *insurance policy* does not protect the *policyholder* from the consequences of his intentional tortious act." (Emphasis added.)

The laws governing workers' compensation establish a mandatory insurance scheme whereby employers must pay for "insurance" coverage to compensate their employees for injuries sustained during the course of employment. Thus, workers' compensation benefits constitute (within the meaning of R.C. 2305.27) payments under an insurance policy or contract where the premium or cost of the policy is paid for by the employer of the person who obtains the award. Hence, pursuant to R.C. 2305.27, workers' compensation benefits cannot be set off against a damage award.

In reaching this conclusion, I am persuaded by this court's recent decision in *Griffey v. Rajan* (1987), 33 Ohio St.3d 75, 80–81, 514 N.E.2d 1122, 1126–1127, wherein Justice Herbert R. Brown, writing for the plurality, held that a plaintiff in a medical malpractice case who failed to disclose her receipt of workers' compensation benefits did not misrepresent her recovery from collateral sources.

I am also persuaded by the fact that had the General Assembly desired that workers' compensation benefits be deducted from an award in a medical malpractice case, it could have done so as it did in R.C. 2317.45(A)(1)(a)(ii). Apparently, under the theory that the General Assembly needs help in drafting legislation, the majority seemingly holds, in order to reach its desired result, that even though the General Assembly did not include workers' compensation benefits, it really meant to do so. In so doing, the majority engages in judicial legislation instead of interpreting the plain language of the statute.

In any event, regardless of whether R.C. 2305.27 prohibits deduction of workers' compensation benefits from an award of damages, workers' compensation benefits clearly do not represent collateral recovery for loss of *earned*

---

25. See, generally, R.C. 4123.01 *et seq.* See, specifically (as just a few of many such examples), R.C. 4123.01(A)(1)(b), 4123.03, 4123.05, 4123.29, 4123.30, 4123.32, 4123.34, 4123.342, 4123.35(A), 4123.38, 4123.74 and 4123.79.

*income.* Therefore, R.C. 2305.27 does not require an award of damages to be offset by workers' compensation benefits.

In *Sharp v. Union Carbide Corp.* (1988), 38 Ohio St.3d 69, 70, 525 N.E.2d 1386, 1387, this court determined that the terms "income" and "earnings" are synonymous and contemplate a recurrent benefit or gain which is derived from " ' * * * *capital, labor, or a combination of both* * * *.' " (Emphasis *sic.*)  Workers' compensation benefits are not the product of a recipient's labor, nor do the benefits constitute a return on capital.  Workers' compensation benefits are not earned by the recipient but, rather, are paid to the recipient for beneficent and humanitarian reasons.

In *Sharp,* we held that Social Security benefits are not "income" as that term is commonly understood.  *Id.*  I see no reason why today's majority should reach a different conclusion with regard to workers' compensation benefits.

For the foregoing reasons, I would hold that workers' compensation benefits do not constitute a collateral source which may be used to reduce the jury's award in the case at bar.

IV

Application of R.C. 2305.27

Applying R.C. 2305.27 is not only unconstitutional but, depending upon how it is applied, R.C. 2305.27 can produce different results.  Take the following example.  B sues A (a physician) for medical malpractice, and the jury awards B $100,000 in damages and apportions negligence sixty percent to A and forty percent to B.  B recovers $50,000 from a collateral source that R.C. 2305.27 requires to be set off against the award.  Pursuant to R.C. 2305.27, the trial court reduces the $100,000 award by the $50,000 collateral source, resulting in a difference of $50,000.  From this figure, the trial court then subtracts $20,000 (forty percent of the $50,000 representing B's apportioned degree of fault) which results in a difference of *$30,000*—B's ultimate recovery on the jury's award.  As an alternative method of calculation, the trial court could first reduce the $100,000 award by an amount equal to B's relative degree of fault (forty percent) resulting in a difference of $60,000.  From this figure, the $50,000 collateral recovery will be subtracted resulting in a difference of $10,000.  Thus, using this formula, B's ultimate recovery on the jury's award will be *$10,000.*

As the foregoing example illustrates, B could receive either $30,000 or $10,000 depending upon the trial court's calculations and, as such, R.C. 2305.27 is bound to result in unequal and nonuniform treatment of individuals

throughout the state of Ohio. It should be noted, however, that R.C. 2305.27 requires that an *award* of damages be reduced by the collateral source. In our example (and literally applying the statute as written) by first reducing the award by the collateral source, we have seen that B would recover $30,000 of the $100,000 jury award. Thus, applying the clear language of R.C. 2305.27, B would recover $80,000 for his injuries ($50,000 from the collateral source and $30,000 on the jury's award) or, in other words, B would recover eighty percent of his damages. This is so even though B is forty percent at fault and, hence, $60,000 (sixty percent of $100,000) would logically be his ceiling for recovery if R.C. 2305.27 made any sense—which it clearly does not.

## IV

### Conclusion

This court is the last bastion upon which most citizens can depend to protect their constitutional rights. Accordingly, this court is obliged to protect an individual's rights to trial by jury (Section 5, Article I) and ensure that the doors of the courthouse remain wide open—not just ajar (Section 16, Article I). We must protect individuals from the arbitrary and unreasonable acts of their government and, thereby, ensure the right of the people to due process of law (Section 16, Article I) and to equal protection of the laws (Section 2, Article I). We must also prohibit the granting of special privileges to some individuals at the expense of others (Section 2, Article I).

With these obligations in mind, I would hold that R.C. 2307.43 and 2305.27 are unconstitutional. The Ohio Constitution is meant to protect every citizen—including those who suffer injuries as a result of medical malpractice.

Furthermore, I believe that R.C. 2305.27 (in addition to being unconstitutional) has no application to workers' compensation benefits received or expected to be received. This would be my response (and I think it should be the response of this court) to the third question certified to us by the United States District Court.

While all the foregoing is pertinent and of general concern to me, my greatest concern is the question of the abridging of the right to trial by jury. The long and storied history of how the right was secured for us should not go unnoticed as some among us sanction the chipping away at the sacred right.

The Resolutions of the Stamp Act Congress adopted on October 19, 1765 stated that " 'trial by jury is [an] inherent and invaluable right of every British subject in these colonies.' " Burnett, The Continental Congress (1941) 10. In November 1772, Samuel Adams wrote that the right of trial by jury

was one of the original, inherent, indefeasible natural rights of free citizens. The First Continental Congress declared in October 1774 that all Americans were entitled to the common law of England, " 'and more especially, to the great inestimable privilege of being tried by their peers of the vicinage.' " Burnett, *supra*, at 54. John Jay (the first Chief Justice of the United States Supreme Court), then a delegate to the First Continental Congress, drafted a statement in accordance with these principles. The Seventh Amendment guaranteeing that, in civil suits at common law, " * * * the right of trial by jury shall be preserved * * * " was passed by Congress on September 24–25, 1789, and ratified by the required number of states by December 15, 1791. And Thomas Jefferson, in his First Inaugural Address in March 1801, referred to trial by jury as an essential star in "the bright constellation which has * * * guided our steps * * * [on] the road which alone leads to peace, liberty, and safety." The Writings of Thomas Jefferson (Padover Ed.1967) 274.

Yet, we find legislation shrinking (or attempting to shrink) the right to trial by jury in, among other instances, determinations of liability for intentional torts (R.C. 4121.80[C] and [D] ), awarding of damages for an intentional tort (R.C. 4121.80[D] ), and assessment of punitive damages (R.C. 2315.21[C][2] ). Further, we find arising in a number of cases coming before this court the question of the validity of jury verdicts and often in close votes, the right has either been preserved or taken away. See, *e.g., Miller v. Wikel, supra,* and *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 543 N.E.2d 464.

In yet another example, we find that as recently as June 1989, the United States Court of Appeals for the Fifth Circuit decided the case of *Brock v. Merrell Dow Pharmaceuticals, Inc.* (C.A.5, 1989), 874 F.2d 307. In its opinion the court gave credence to what is called " * * * a growing realization among academics, lawyers, and judges that cases such as this present special problems and challenges to traditional ideas regarding the role of the jury as a decisionmaker." *Id.* at 309. In other words, the court stated that the deciding of complex scientific issues might better be left to judges rather than juries.

As a final example, I draw attention to S. 489, 102 Cong., 1st Sess., introduced by Senator Hatch in the Senate of the United States on February 26, 1991. The stated purpose of the Bill is "[t]o provide grants to States to encourage States to improve their systems for compensating individuals in the course of the provision of health care services, to establish uniform criteria for awarding damages in health care malpractice actions, and for other purposes[.]" 137 Cong.Rec. S 2324 (daily ed. Feb. 26, 1991). In the "Findings and Purpose" clause, the Bill provides that, among other things, Congress finds that " * * * the civil judicial system is a costly and inefficient mecha-

nism for resolving claims of health care malpractice and compensating injured patients, * * * " Section 2(a)(5), 137 Cong.Rec., *supra,* at S 2325. In order for a state to receive the alleged benefits of the Bill, one of the requirements is that an "Alternative Dispute Resolution System" be established. This system would become mandatory and binding and, in fact, could include arbitration (again, no jury). Section 102(d)(4), 137 Cong.Rec., *supra,* at S 2327. If an injured individual (victim) refuses to participate in arbitration and, instead, initiates a health care malpractice action, then the Bill provides: that such a person-plaintiff may only prevail if he or she proves each element of his or her case *beyond a reasonable doubt;* that the plaintiff must establish that a defendant was *grossly negligent;* and that the amount of damages for noneconomic losses which a plaintiff may recover shall not *exceed* $150,000. Section 102(d)(5)(A) and (B), 137 Cong.Rec., *supra,* at S 2327.

Unless and until we draw the line, this erosion of the right to trial by jury will continue, and as we have seen in the loss of other constitutional rights, once the rights are lost, the recovery of those rights is difficult at best and often impossible.

For the foregoing reasons, I concur in part and dissent in part.

RESNICK, J., concurs in the foregoing opinion.