Pfeifer, J.,
dissenting.
I. R.C. 2315.18
A. Right to Trial by Jury
{¶ 163} “So long as the trial by jury is a part of our system of jurisprudence, its constitutional integrity and importance should be jealously safeguarded. The right of trial by jury should be as inviolate in the working of our courts as it is in the wording of our Constitutions.” Gibbs v. Girard (1913), 88 Ohio St. 34, 47, 102 N.E. 299. Instead of jealously safeguarding the right to trial by jury, the majority opinion in this case eviscerates it by holding constitutional a statute that enables courts to “enter judgments in disregard of the jury’s verdict.” Sorrell v. Thevenir (1994), 69 Ohio St.3d 415, 422, 633 N.E.2d 504. Instead of jealously safeguarding the right to trial by jury, the majority opinion employs shallow reasoning and shoddy logic in concluding that juries can meaningfully determine only facts that do not conflict with predetermined assessments of the General Assembly. Instead of jealously safeguarding the right to trial by jury, the majority opinion “cleans the scalpel for the legislature to cut away unrestrainedly at the whole field of tort redress.” Meech v. Hillhaven W., Inc. (1989), 238 Mont. 21, 52, 776 P.2d 488 (Sheehy, J., dissenting).
{¶ 164} The Constitution states that “[t]he right of trial by jury shall be inviolate * * *.” Section 5, Article I, Ohio Constitution. We have held that “[t]he right of trial by jury, being guaranteed to all our citizens by the Constitution of the state, cannot be invaded or violated by either legislative act or judicial order or decree.” Gibbs, 88 Ohio St. 34, 102 N.E. 299, at paragraph two of the syllabus. This court has held that “[wjhat the Constitution grants, no statute may take away.” State ex rel. Hoel v. Brown (1922), 105 Ohio St. 479, 138 N.E. 230, paragraph three of the syllabus. Thomas Jefferson considered trial by jury “the only anchor ever yet imagined by man, by which a government can be held *504 to the principles of its constitution.” Letter from Thomas Jefferson to Thomas Paine, 1789, http://etext.virginia.edu/jefferson/quotations/jeffl520.htm. The United States Supreme Court has stated that “[t]he right of trial by jury is of ancient origin, characterized by Blackstone as ‘the glory of the English law’ * * *. Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.” Dimick v. Schiedt (1935), 293 U.S. 474, 485-486, 55 S.Ct. 296, 79 L.Ed. 603.
{¶ 165} In the face of such forceful and clear language and contrary to many holdings of this court, the majority opinion concludes that jury findings of fact can be altered without violating the right to trial by jury. The reasons advanced by the majority opinion to buttress its assault on a fundamental constitutional right are insubstantial, legally unsupported, and in many cases disingenuous. Neither separately nor collectively do they support upholding as constitutional a statute that infringes upon the right to trial by jury.
{¶ 166} The majority states that “[s]o long as the [jury’s] fact-finding process is not intruded upon and the resulting findings of fact are not ignored or replaced by another body’s findings, awards may be altered as a matter of law.” (Emphasis sic.) As support for this statement of first impression, the majority offers the irrelevant Conley v. Shearer (1992), 64 Ohio St.3d 284, 595 N.E.2d 862. In Conley, Kurt Shearer argued that he was immune from liability because he was a governmental employee. Whether Shearer was entitled to immunity was deemed a question of law that was not triable to a jury. Id. at 292, 595 N.E.2d 862. It is impossible to determine why the majority cites this case to support its decision to allow a statute to circumvent what the majority itself calls “one of the most fundamental and long-standing rights in our legal system, having derived originally from the Magna Carta.”
{¶ 167} The majority next states that there are “several ways in which a court may apply the law to change a jury award of damages without running afoul of the Constitution” and that among these is remittitur. Though the majority opinion notes parenthetically that a plaintiff must consent to remittitur, it does not explain that the sole reason remittitur does not violate the right to a trial by jury is that remittitur cannot be granted without the consent of the prevailing party. See, e.g., Wightman v. Consol. Rail Corp. (1999), 86 Ohio St.3d 431, 444, 715 N.E.2d 546. Thus, although remittitur is grounded in a court’s inherent authority to remit an excessive award, it does not infringe upon a plaintiffs right to a trial by jury because “[njeither the trial court nor any reviewing court has power or authority to reduce a verdict on any grounds without the assent of the prevailing party, unless the undisputed testimony shows an error in mathematical calculation.” Chester Park v. Schulte (1929), 120 Ohio St. 273, 166 N.E. 186, *505 paragraph four of the syllabus. Chief Justice Moyer has stated that a “trial court has only limited authority to offer remittitur.” Wightman, 86 Ohio St.3d at 446, 715 N.E.2d 546 (Moyer, C.J., dissenting). That limited authority is now offered as a basis for holding that courts may alter a jury award, even when a new trial is not an option.
{¶ 168} The majority opinion next states that because the treble-damages provisions of R.C. 901.51,1331.08,1345.09, 2307.61, 2923.34(E), and 4905.61, which increase a jury award, have never been held to infringe the right to a trial by jury, R.C. 2315.18, which can decrease a jury award, “cannot logically violate that right.” The fact that we have not declared a statute unconstitutional' does not mean that a similar statute is automatically constitutional. There are many potential reasons that this court has never held treble-damages provisions to be constitutional or unconstitutional. Perhaps the issue has never been raised or properly before this court. Perhaps treble damages are unconstitutional. Perhaps treble damages are a penalty, not damages, as five members of the majority recently ruled with respect to R.C. 4905.61, in Cleveland Mobile Radio Sales, Inc. v. Verizon Wireless, 113 Ohio St.3d 394, 2007-Ohio-2203, 865 N.E.2d 1275, at ¶ 19. Whatever the reason, one thing is clear: the majority opinion’s discussion of this issue is superficial or disingenuous.
{¶ 169} The majority next states that R.C. 2315.18 is nothing more than a policy choice by the General Assembly. A jury award for noneconomic damages in excess of the limit imposed by R.C. 2315.18 will be reduced automatically by the judge as a matter of law. According to the majority opinion, that reduction does “not alter the findings of facts themselves.” The members of the majority profess to believe that because the findings of fact are ignored, not changed, the requirements of the Constitution have been observed. See Sofie v. Fibreboard Corp. (1989), 112 Wash.2d 636, 655, 771 P.2d 711 (“saying that the right to trial by jury is not invaded if the jury is allowed to determine facts which go unheeded when the court issues its judgment * * * pays lip service to the form of the jury but robs the institution of its function”). This court has never before paid mere lip service to the right to trial by jury. In Galayda v. Lake Hosp. Sys., Inc. (1994), 71 Ohio St.3d 421, 425, 644 N.E.2d 298, we stated that the right to trial by jury includes “the right to have a jury determine all questions of fact, including the amount of damages to which the plaintiff is entitled.” Chief Justice Moyer, the author of today’s majority opinion, has written that “the right to a trial by jury includes a determination by the jury of all questions of fact, as well as the amount of compensatory damages to which the plaintiff is entitled.” Galayda at 436, 644 N.E.2d 298 (Moyer, C.J., dissenting). But today, Chief Justice Moyer concludes that the Constitution protects “a determination by the jury * * * of compensatory damages to which the plaintiff is entitled” only as long as the damages do not exceed a limit predetermined by the General Assembly. Accord *506 ing to the majority opinion, the Ohio Constitution does little more than enable the jury to determine facts — what a judge does with those factual determinations is of no constitutional consequence. Plainly, the majority doesn’t think the right to a trial by jury entitles a plaintiff to much protection. The founding fathers thought much more highly of the right. Among the “repeated injuries and usurpations” that caused them to declare their independence from the King of England was his refusal to confer “the benefits of Trial by Jury.” Declaration of Independence, July 4, 1776. Ignoring factual findings is the equivalent of changing them. Ignoring factual findings is the equivalent of rendering those findings impotent. See Lakin v. Senco Prods., Inc. (1999), 329 Ore. 62, 79, 987 P.2d 463 (“to the extent that the jury’s award exceeds the statutory cap, the statute prevents the jury’s award from having its full and intended effect”). However you characterize it, a statute that authorizes a judge to ignore or change factual findings deprives litigants “of the benefits of Trial by Jury” and must be declared unconstitutional.
{¶ 170} If a damages cap of $250,000 is constitutional — the majority opinion mentions the amount, but never discusses it, apparently giving it no significance — why can’t the General Assembly limit damages for claims they do not favor to $100,000? Or $1,000? Or $10? Under this court’s reasoning, there is nothing in the Ohio Constitution to restrain the General Assembly from limiting noneconomic damages to $1. In essence, the power to cap noneconomic damages is the power to eliminate them. But the General Assembly does not have this power; only the people by the amendment process have this power. After today, what meaning is left in a litigant’s constitutional right to have a jury determine damages?
{¶ 171} The majority opinion next states that R.C. 2315.18 “is distinguishable” from the statutes declared unconstitutional in Sorrell and Galayda, but it does not explain how. In Galayda, a statute was declared unconstitutional because it allowed payment of a jury award over a period of years, thus invading “the jury’s province to determine damages, and [violating] a plaintiffs right to trial by jury.” Id., 71 Ohio St.3d at 425-426, 644 N.E.2d 298. In the instant case, a statute authorizes a judge to reduce a jury award. The statutes in question have the same result, differing in degree only: both decrease the real value of a damages award. One statute was held unconstitutional, the other “is distinguishable.” Referring to Galayda, one of the amicus briefs asks, “[W]hy is it unconstitutional to impose payments by installment on a total verdict of $1,396,125, but at the same time constitutional to flatly reduce that same verdict by over $1,000,000?” (Emphasis sic.) The brief characterizes this inconsistency as an “impenetrable conundrum.” And so it will remain, because the majority opinion does not explain the putative distinguishing features. The distinction between the statute in Sorrell, which was held unconstitutional because, as the majority today admits, *507 it “allow[ed] courts to substitute their own findings of fact on collateral benefits,” and the statute here, which allows courts to ignore the jury’s findings of facts on damages, also is unexplained by the majority. See Sorrell, 69 Ohio St.3d at 422, 633 N.E.2d 504 (“courts may, consistent with R.C. 2317.45, enter judgments in disregard of the jury’s verdict and thus violate the plaintiffs right to have all facts determined by the jury, including damages”).
{¶ 172} Finally, with respect to the right to trial by jury, the majority states that these limitations are constitutional under the “Seventh Amendment right to a jury trial in the federal system,” citing Estate of Sisk v. Manzanares (D.Kan. 2003), 270 F.Supp.2d 1265. Although possibly accurate, this assessment is not supported by citation of a case from the United States Supreme Court and is contrary to Dimick, 293 U.S. at 480, 55 S.Ct. 296, 79 L.Ed. 603, in which the United States Supreme Court, quoting Mayne’s Treatise on Damages (9th Ed.1920) 571, stated that “ ‘in cases where the amount of damages was uncertain their assessment was a matter so peculiarly within the province of the jury that the Court should not alter it.’ ” Estate of Sisk is, with all due respect to the members of the majority and the district court magistrate in Kansas who wrote it, wholly irrelevant. Our task today is to decide whether R.C. 2315.18 violates Section 5, Article I of the Ohio Constitution. That a federal district court judge in Kansas has determined that a federal statute does not violate the Seventh Amendment is beside the point.
{¶ 173} To summarize, the majority opinion concludes that R.C. 2315.18 does not infringe upon the constitutional right to trial by jury. It reaches that conclusion by relying on (1) an irrelevant case, (2) remittitur, which supports a contrary conclusion, (3) a patently superficial argument, (4) a policy-trumps-the-Ohio-Constitution argument, (5) an unexplained argument that two prior cases are distinguishable, and (6) an irrelevant citation of a federal trial court case. It isn’t much of an explanation. Actually, it’s nothing. But these six paltry reasons are the only justification the majority provides to support its decision to uphold the constitutionality of a statute that requires judges to arbitrarily diminish a jury’s factual finding of damages.
{¶ 174} I would hold that R.C. 2315.18 is unconstitutional because it infringes on the constitutional right to a trial by jury. It does so by intruding on the plaintiffs right to have a jury meaningfully determine damages. I believe that a statute that automatically reduces a jury’s factual determination of damages to an arbitrary level, no matter how high that level might be, violates the constitutional right to trial by jury.
B. Due Process and Equal Protection
{¶ 175} Even though there is no need to go further with respect to R.C. 2315.18, some of the majority opinion’s other arguments necessitate further *508 discussion. For example, the majority opinion introduces Arbino’s due-process argument by stating that “[bjecause we have already concluded that R.C. 2315.18 violates neither the right to a jury trial nor the right to a remedy, we must find it valid” if it satisfies the rational-basis test. Applying the rational-basis test in this instance is contrary to our approach in Sorrell, in which we stated that “the right to a jury trial in negligence and personal injury actions is a fundamental right. Thus in order to determine whether R.C. 2317.45 [part of the Tort Reform Act of 1987] violates the Due Process Clause of the Ohio Constitution, a strict scrutiny standard of review applies.” Id. at 423, 633 N.E.2d 504. In Morris v. Savoy (1991), 61 Ohio St.3d 684, 689, 576 N.E.2d 765, a case in which Chief Justice Moyer was a member of the majority, this court applied the rational-basis test only because the case “did not involve a fundamental right or suspect class.” See also State ex rel. Ohio Academy of Trial Lawyers v. Sheward (1999), 86 Ohio St.3d 451, 486, 715 N.E.2d 1062, fn. 14 (“a finding that the right to trial by jury was implicated would have invoked a higher level of judicial scrutiny [than rational basis] for purposes of the due process analysis”). The majority opinion does not address this language from Sowell, Savoy, or Sheward even though it is exactly on point as to the level of scrutiny to be applied to R.C. 2315.18.
{¶ 176} Instead, the majority opinion applies the rational-basis test, and concludes that R.C. 2315.18 is rationally related to a legitimate government purpose. I believe that it is more appropriate to apply strict scrutiny to R.C. 2315.18, invalidating it unless it is “necessary to promote a compelling governmental interest,” Morris, 61 Ohio St.3d at 705, 576 N.E.2d 765, citing Shapiro v. Thompson (1969), 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600. Even applying a rational-basis test, however, it is clear that there is no objective reason to conclude that R.C. 2315.18 is rationally related to a legitimate government purpose. My analysis begins with an examination of the General Assembly’s findings to establish how unrelated they are to the general welfare of Ohioans.
{¶ 177} “The General Assembly makes the following statement of findings and intent:
{¶ 178} “(A) The General Assembly finds:
{¶ 179} “(1) The current civil litigation system represents a challenge to the economy of the state of Ohio, which is dependent on business providing essential jobs and creative innovation.
{¶ 180} “(2) The General Assembly recognizes that a fair system of civil justice strikes an essential balance between the rights of those who have been legitimately harmed and the rights of those who have been unfairly sued.
{¶ 181} “(3) This state has a rational and legitimate state interest in making certain that Ohio has a fair, predictable system of civil justice that preserves the rights of those who have been harmed by negligent behavior, while curbing the *509 number of frivolous lawsuits, which increases the cost of doing business, threatens Ohio jobs, drives up costs to consumers, and may stifle innovation.” 2004 Am.Sub.S.B. No. 80, Section 3,150 Ohio Laws, Part IV, 8024.
{¶ 182} Section 3(A)(2) doesn’t make sense. It states that a fair system of civil litigation, presumably one that includes R.C. 2315.18, should balance the rights of the legitimately harmed with the rights of the unfairly sued. The rights of people who have been harmed and who prove the legitimacy of their case by prevailing in a trial cannot be balanced against the rights of the unfairly sued. They are mutually exclusive groups — people harmed by the tortious conduct of others don’t unfairly sue. In imposing caps, R.C. 2315.18 decreases the protection afforded to legitimate plaintiffs yet does nothing to protect the unfairly sued. Where is the fairness in that system?
{¶ 183} The predictability of the new system implicitly touted in the findings results solely from the arbitrary and, in my view, unconstitutional diminishment of a jury’s factual findings of damages.
{¶ 184} That Section 3(A)(3) of Am.Sub.S.B. No. 80 mentions frivolous lawsuits is somewhat surprising, because nothing in the statutory scheme addresses frivolous lawsuits, and damages caps are not even remotely related to frivolous lawsuits. The caps imposed by the statutory scheme can affect only those plaintiffs with meritorious claims, plaintiffs who have prevailed in a trial and who have suffered significant damages. These plaintiffs are exactly the opposite of those who file frivolous lawsuits. Finally, although Section 3(A)(3) lists a series of detrimental effects caused by frivolous lawsuits, nothing in the section suggests that excessive damages awards, the putative target of R.C. 2315.18, cause similar detrimental effects.
{¶ 185} The tort system in Ohio is far from perfect. The various trial and defense attorneys involved in our tort system are not perfect either. There is no doubt much room for improvement in the way the tort system in Ohio functions. For instance, our tort system would better serve the public if frivolous lawsuits were never filed and if excessive paper-churning, fee-building discovery practices were curtailed. There is no rational reason to “improve” the tort system in Ohio at the sole expense of a small group of people who are able to prove that they suffered damage significant enough to exceed the damages caps imposed by the General Assembly. Whatever improvement the tort system in Ohio needs, the Ohio Constitution should remain inviolate, unless properly amended.
{¶ 186} My analysis continues with an examination of the evidence the General Assembly relied on to support its findings to determine whether they bear “a reasonable and substantial relation to the public welfare.” State ex rel. Bowman v. Allen Cty. Bd. of Commrs. (1931), 124 Ohio St. 174, 177 N.E. 271, paragraph three of the syllabus. See also Tocqueville, Democracy in America (Heffner *510 Ed.1956) 76 (“the power vested in the American courts of justice, of pronouncing a statute to be unconstitutional, forms one of the most powerful barriers which has ever been devised against the tyranny of political assemblies”).
{¶ 187} Uncodified Section 3 of Am.Sub.S.B. No. 80 further states:
{¶ 188} “The General Assembly bases its findings on this state interest upon the following evidence:
{¶ 189} “(a) A National Bureau of Economic Research study estimates that states that have adopted abuse reforms have experienced employment growth between eleven and twelve per cent, productivity growth of seven to eight per cent, and total output growth between ten and twenty per cent for liability reducing reforms.
{¶ 190} “(b) According to a 2002 study from the White House Council of Economic Advisors, the cost of tort litigation is equal to a two and one tenth per cent wage and salary tax, a one and three tenth per cent tax on personal consumption, and a three and one tenth per cent tax on capital investment income.
{¶ 191} “(c) The 2003 Harris Poll of nine hundred and twenty-eight senior corporate attorneys conducted by the United States Chamber of Commerce’s Institute for Legal Reform reports that eight out of ten respondents claim that the litigation environment in a state could affect important business decisions about their company, such as where to locate or do business. In addition, one in four senior attorneys surveyed cited limits on damages as one specific means for state policy makers to improve the litigation environment in their state and promote economic development.
{¶ 192} “(d) The cost of the United States tort system grew at a record rate in 2001, according to a February 2003 study published by TillinghasL-Towers Perrin. The system, however, failed to return even fifty cents for every dollar to people who were injured. TillinghasL-Towers Perrin also found that fifty-four per cent of the total cost accounted for attorney’s fees, both for plaintiffs and defendants, and administration. Only twenty-two per cent of the tort system’s cost was used directly to reimburse people for the economic damages associated with injuries and losses they sustain.
{¶ 193} “(e) The Tillinghast-Towers Perrin study also found that the cost of the United States tort system grew fourteen and three tenths of a per cent in 2001, the highest increase since 1986, greatly exceeding overall economic growth of two and six tenth per cent. As a result, the cost of the United States tort system rose to two hundred and five billion dollars total or seven hundred and twenty-one dollars per citizen, equal to a five per cent tax on wages.
*511 {¶ 194} “(f) As stated in testimony by Ohio Department of Development Director Bruce Johnson, as a percentage of the gross domestic product, United States tort costs have grown from six tenths of a per cent to two per cent since 1950, about double the percentage that other industrialized nations pay annually. These tort costs put Ohio businesses at a disadvantage vis-a-vis foreign competition and are not helpful to development.” Section 3(A)(3), Am.Sub.S.B. No. 80, 150 Ohio Laws, Part IV, 8024.
{¶ 195} The evidence in Section 3(A)(3) is not objective, not peer-reviewed, not Ohio-specific, and, in most cases, significantly flawed. First, apart from a couple of anecdotes, the findings do not relate specifically to Ohio. On that ground alone it is unreasonable to conclude that R.C. 2315.18 is rationally related to the general welfare of Ohioans.
{¶ 196} Second, most of the findings are the product of biased sources. The National Bureau of Economic Research (“NBER”) study cited in Section 3(A)(3)(a) was produced by an organization that calls itself “a private, nonprofit, nonpartisan research organization dedicated to promoting a greater understanding of how the economy works.” See http://www.nber.org/info.html. But see http://www.mediatransparency.org/recipientgrants.php?recipientID=243, which suggests that NBER’s source of funding is not nonpartisan. The White House Council of Economic Advisors study cited in Section 3(A)(3)(b) is the work product of three political appointees. See http://www.whitehouse.gov/cea/. The 2003 Harris Poll of 928 attorneys cited in Section 3(A)(3)(c) is a survey solely of corporate attorneys. The Tillinghast-Towers Perrin 2003 study cited in Section 3(A)(3)(d) and (e) was produced by a company whose business is to “provide[ ] consulting and software solutions to insurance and financial services companies.” See http://www.towersperrin.com/tp/jsp/masterbrand_html.jsp?webc=176/global/ about/about.htm&selected=about. Bruce Johnson, the director of the Ohio Department of Development, whose testimony is cited in Section 3(A)(3)(f), is a political appointee.
{¶ 197} In short, none of the evidence is the product of authentic, objective research. See Abaray, Déjá Vu All Over Again: Ohio’s 2005 Tort Reform Act Cannot Survive a Rational Basis Challenge (2006), 31 U.Dayton L.Rev. 141. The National Bureau of Economic Research Study is not peer-reviewed and is not published in a scholarly journal. Id. at 154. The authors purport to rely on empirical evidence from states that have instituted tort reform, but it is impossible to verify the reliability of their conclusions. The authors themselves concede that although their results “ ‘are consistent with the hypothesis that reductions in liability from the current common-law levels improve efficiency, * * * the results are also consistent with three other alternative hypotheses’ ” (Emphasis added.) 31 U.Dayton L.Rev. at 154, quoting the NBER study at 28, fn. 65. It would be *512 difficult to summarize the study better than the author of the Dayton Law Review article did: “[I]n relying upon this report, the General Assembly cites as a basis for upsetting 200 years of common law a flawed study, which is not peer reviewed, has no indicia of reliability, omits referenced data, and reaches a conclusion that can be due to any of four different factors. Moreover, the authors base their analysis on national data from 1969 through 1990, providing scant relevance to Ohio law in 2005 * * 31 U.Dayton L.Rev. at 154-155.
{¶ 198} The 2002 study by the White House Council of Economic Advisors is also not peer-reviewed, is not published in a scholarly journal, and is not even a study — it is a white paper. “A white paper is generally understood to be a position or policy paper of an organization. As such, white papers do not purport to represent an objective review of empirical data.” (Emphasis sic.) Id. at 155. Further, this “study” contains several empirical flaws, too detailed to explain here, and is based on the Tillinghast report, which, as explained below, is itself flawed. See id. at 156.
{¶ 199} The 2003 Harris Poll of 928 senior corporate attorneys is just that: a poll. Does this even need to be explained? It should surprise no one that corporate attorneys think tort costs are too high; they represent the companies that commit the torts and, therefore, pay the costs. Anyone who would cite a poll of senior corporate attorneys as an excuse for enacting pro-corporate legislation would probably also cite Charlie Wilson’s maxim, “What’s good for the country is good for General Motors, and vice versa.”
{¶ 200} The 2003 Tillinghasb-Towers Perrin study, like the others, is not peer-reviewed, is not from a scholarly journal, and contains many flaws. 31 U.Dayton L.Rev. at 158. For instance, the conclusions the study draws are based in part on the inclusion of the costs of medical malpractice. Id. A study that includes the costs of medical malpractice cannot rationally be used to justify enacting R.C. 2315.18, which expressly does not apply to medical-malpractice claims. R.C. 2315.18(A)(7). The study “also cites increases in the cost of medical care as a cause for an increase in jury verdict awards.” Id. at 159. Medical costs are economic costs, which are outside the purview of R.C. 2315.18.
{¶ 201} The General Assembly relies on the Tillinghast study’s conclusion that the “cost of the United States tort system grew at a record rate in 2001,” specifically, 14.4 percent. Id. at 158. Even if that statement is true, and there is no particular reason to believe that it is, it is highly selective. The same study indicates that the cost of the national tort system grew only 3.3 percent throughout the 1990s, a much lower rate than in the previous four decades, and that the growth rate of the tort system was only 5.4 percent in 2003. 31 U.Dayton L.Rev. at 159, quoting a 2004 Tillinghast update on nationwide tort costs. Further, those rates of increase include the cost of medical-malpractice *513 awards, to which R.C. 2315.18 does not apply. There is no rational relationship between this flawed study of the national tort system and R.C. 2315.18.
{¶ 202} The Tillinghast study and the General Assembly include the cost of defense litigation in determining the percentage of money paid to plaintiffs.[12] Id. at 159. Section 3(A)(3)(d) states that “[o]nly twenty-two per cent of the tort system’s cost was used directly to reimburse people for the economic damages associated with injuries and losses they sustain.” That has a certain ring of truth, but in reality, the statement is grossly misleading. “If the defense and insurance costs are excluded, the Tillinghast figures actually demonstrate that the total amount awarded in tort cases nationwide for economic loss equals 34%, noneconomic loss equals 38%, and claimant attorney fees equals 27% of total awards.” 31 U.Dayton L.Rev. at 160; see also Chimerine & Eisenbrey, The Frivolous Case for Tort Law Change: Opponents of the Legal System Exaggerate Its Costs and Ignore Its Benefits (May 17, 2005), Economic Policy Institute Briefing Paper No. 157, at 4-5, available at http://www.epi.org/content.cfm/bpl57. The Tillinghast study is misleading, biased, flawed, and disingenuous, and it cannot be the rational basis for enacting a statute in Ohio. Further, the Tillinghast study is impossible to verify because Tillinghast “claims that its data and methodology are ‘proprietary.’ ” Chimerine at 3.
{¶ 203} Last, we come to the testimony of Bruce Johnson. Johnson, a political appointee of a governor who desperately wanted to impose tort reform on all Ohioans, relied extensively on the flawed Tillinghast study. Moreover, other than anecdotal evidence and unverifiable statistics, Johnson’s testimony is not related to Ohio. 31 U.Dayton L.Rev. at 162.
{¶ 204} None of the General Assembly’s findings are reliable with respect to addressing Ohio-specific problems. First, the findings do not relate specifically to Ohio. Second, all of the proffered evidence is the product of biased sources with political agendas. Third, the studies contain serious flaws, relying either on information that they do not provide or on information (medical-malpractice awards) that is not relevant to R.C. 2315.18. In short, these findings do not support a conclusion that R.C. 2315.18 is rationally related to' a legitimate government purpose in Ohio. I conclude that the General Assembly’s reliance on this evidence to justify enacting R.C. 2315.18 was arbitrary and unreasonable. Accordingly, R.C. 2315.18 violates due process.
{¶ 205} Given these flaws, it is obvious that R.C. 2315.18 cannot withstand equal-protection scrutiny. The majority opinion again applies the rational-basis *514 test, even though it should apply strict scrutiny, and again, R.C. 2315.18 cannot withstand even the less demanding test. The degree of equal-protection scrutiny depends on whether a fundamental right is involved. Beatty v. Akron City Hosp. (1981), 67 Ohio St.2d 483, 492, 21 O.O.3d 302, 424 N.E.2d 586 (“once the existence of a fundamental right * * * is shown to be involved, the state must assume the heavy burden of proving that the legislation is constitutional”). See Schwan v. Riverside Methodist Hosp. (1983), 6 Ohio St.3d 300, 301, 6 OBR 361, 452 N.E.2d 1337 (the rational-basis test was applied because the case did not “involve either a fundamental right or a suspect class”); Moms, 61 Ohio St.3d at 689, 576 N.E.2d 765 (citing Schwan); State v. Thompson, 95 Ohio St.3d 264, 2002-Ohio-2124, 767 N.E.2d 251, ¶ 13 (classifications that affect a fundamental constitutional right are subject to strict-scrutiny inquiry). Given the deeply flawed nature of the General Assembly’s findings, it is clear that, were R.C. 2315.18 subjected to strict scrutiny, it would fail. Further, given my analysis above, it is clear that R.C. 2315.18 cannot withstand even rational-basis scrutiny. The majority opinion reaches a contrary conclusion, stating that “the General Assembly reviewed several studies and other forms of evidence” to justify its conclusions. But as noted, those studies and evidence are so biased, flawed, and insubstantial that reliance on them is arbitrary and unreasonable.
{¶ 206} The statutory scheme creates two classes of tort victims: those with catastrophic or minor injuries, who are able to recover the full measure of their damages, and those with significant but not catastrophic injuries, who are able to recover only a portion of their damages. “Equal protection of the laws requires the existence of reasonable grounds for making a distinction between those within and those outside a designated class.” Morris, 61 Ohio St.3d at 691, 576 N.E.2d 765. Objectively, the classification in this case is not rationally related to anything, let alone a legitimate governmental interest. The majority opinion should explain how this classification is reasonably related to improving business conditions in Ohio. Further, Chief Justice Moyer should explain why his consideration of the caps before us is so radically different from his analysis in Moms.
{¶ 207} The majority opinion states that “one cannot deny that noneconomicdamages awards are inherently subjective and difficult to evaluate.” I agree that “noneconomic-damage awards are inherently subjective.” So are many of the good things in life, for instance, religion, love, and which college football team to root for. That something is subjective does not make it evil. Further, amounts below the statutory threshold are no less subjective than amounts above the statutory threshold. I also agree that noneconomic-damages awards are “difficult to evaluate.” I have great faith in Ohio’s jury system; so should the members of the majority, each of whom has extensive experience working with juries, either as a judge or an attorney and, therefore, has good cause to know how diligently and seriously juries approach their task to discover the truth.
*515 {¶ 208} Juries hear the evidence presented, assess the reliability and credibility of the witnesses, and consider the law as presented to them by the trial court. They process this information and determine damages to the best of their ability, and they do it well. This court has stated that because there “is no standard by which * * * pain and suffering may be measured,” there is “ ‘no substitute for simple human evaluation.’ ” Fantozzi v. Sanduzky Cement Prods. Co. (1992), 64 Ohio St.3d 601, 612, 597 N.E.2d 474, quoting Flory v. New York Cent. RR. Co. (1959), 170 Ohio St. 185, 190, 10 O.O.2d 126, 163 N.E.2d 902. Yet the majority opinion would take the determination of damages away from juries and replace it with a limit predetermined by a legislative body that has not reviewed facts, not heard evidence, not weighed the credibility of witnesses, and not considered the law. The majority opinion would replace “simple human evaluation” with judgment from above by the General Assembly.
{¶ 209} I have always had great faith in the ability of Ohio juries to reach just determinations. So apparently does Republican Representative Scott Oelslager. The chairman of the House Judiciary Committee at the time R.C. 2315.18 was enacted, Oelslager held 15 hearings on tort reform and concluded that “there is no systematic runaway-jury problem in Ohio.” Cleveland Plain Dealer (Nov. 26, 2004). “According to the latest data available from Jury Verdict Research, a service based in Horsham, Pa., jury awards in Ohio were below national averages from 1996 through 2002.” Byczkowski, Reform or Restriction? Cincinnati Enquirer (Nov. 28, 2004) Jl. “The median compensatory award — which includes economic and non-economic damages — was $15,000 in Ohio. That’s less than half the national median of $37,054 and less than any surrounding state.” Id.
{¶ 210} The majority opinion states that “the record here draws a clear connection between limiting uncertain and potentially tainted noneconomic damages awards and the economic problems demonstrated in the evidence.” Actually, the General Assembly’s findings contain no evidence of tainted damages awards or economic problems — they contain only unsubstantiated conclusions supplied by biased organizations with political agendas. There is also, as shown, no established connection between the General Assembly’s nationwide findings and R.C. 2315.18. It should be clear that the General Assembly’s findings, which are flawed and not Ohio-specific, and which run counter to the above-cited Ohio-specific statements, are arbitrary and unreasonable and cannot be the rational basis for enacting R.C. 2315.18.
{¶ 211} R.C. 2315.18 is purportedly a pro-business piece of legislation, designed to encourage businesses to move to or expand in Ohio. But the statutory caps imposed by R.C. 2315.18 would benefit any business located anywhere in the world. In this case, Johnson & Johnson, a New Jersey-based multinational corporation, will be protected by the caps, whether or not it has business *516 operations in Ohio. The Chinese manufacturers of toys containing toxic paint so prominently in the news recently would also be protected. This is á further example of how little rational relationship there is between R.C. 2315.18 and its purported rationale and the general welfare of Ohioans. The only basis for R.C. 2315.18 that I can see is that, as between business interests and the people of Ohio, the legislature prefers business. That is not a constitutional basis on which to found a statute.
{¶ 212} I would hold that R.C. 2315.18 violates due process and equal protection and, therefore, is unconstitutional.
II. R.C. 2315.21
{¶ 213} In imposing a cap on punitive damages, R.C. 2315.21 suffers from the same flaws with respect to the constitutional right to trial by jury as R.C. 2315.18. It is uncontroverted that “the assessment of punitive damages by the jury stems from the common law and is encompassed within the right to trial by jury.” Zoppo v. Homestead Ins. Co. (1994), 71 Ohio St.3d 552, 557, 644 N.E.2d 397. Nevertheless, the majority opinion states that R.C. 2315.21 “permits the trier of fact to determine punitive damages. The subsequent application of a statute to this decision does not abrogate the established function of the jury.” In Sheward, we stated the opposite, that “a statute that allows the jury to determine the amount of punitive damages to be awarded but denies the litigant the benefit of that determination stands on no better constitutional footing than one that precludes the jury from making the determination in the first instance.” Sheward, 86 Ohio St.3d at 484-485, 715 N.E.2d 1062. The majority opinion does not address this contradiction or any of the other contradictions explained in this dissent. It should provide a nonconclusory explanation of each statement that contradicts a prior statement of this court. Whether the majority opinion applies the supercilious Galatis test is irrelevant, but it should definitively overrule cases that it contradicts. See Westfield Ins. Co. v. Galatis, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256. Even the General Assembly realizes that its new tort-reform statutory scheme is contrary to holdings of this court; otherwise it wouldn’t have asked this court to “reconsider its holding on damage caps in State [ex rel. Ohio Academy of Trial Lawyers] v. Sheward (1999), [86] Ohio St.3d 451 [715 N.E.2d 1062], to reconsider its holding on the deductibility of collateral source benefits in Sorrel[l] v. Thevenir (1994), 69 Ohio St.3d 415 [633 N.E.2d 504], and to reconsider its holding on statutes of repose in Brennaman v. R.M.I. Co. (1994), 70 Ohio St.3d 460 [639 N.E.2d 425].” S.B. 80, Section 3(E), 150 Ohio Laws, Part V, 8031. The majority opinion should overrule the cases it contra- *517 diets and comprehensively explain its logic. Characterizing all contrary statements as “dicta” is no substitute for nonconclusory analysis.
{¶ 214} The majority opinion explains that because the jury determines the fact of punitive damages, the subsequent statutorily required diminution of that damages amount does not intrude on the jury’s findings. The majority opinion states that the automatic arbitrary diminution of a damages award does not affect the jury’s factual determination. “The more one tries to explain this extraordinary result the less another can understand it.” Marshall v. Gibson (1985), 19 Ohio St.3d 10, 14, 19 OBR 8, 482 N.E.2d 583 (Wright, J., dissenting). I would hold that R.C. 2315.21 violates the right to trial by jury because it “impairs the traditional function of the jury in determining the appropriate amount of damages.” Zoppo, 71 Ohio St.3d at 557, 644 N.E.2d 397 (holding unconstitutional a prior version of R.C. 2315.21, which provided that the court, not the jury, would determine the amount of punitive or exemplary damages).
{¶ 215} Citing Cooper Industries, Inc. v. Leatherman Tool Group, Inc. (2001), 532 U.S. 424, 433, 121 S.Ct. 1678, 149 L.Ed.2d 674, the majority opinion states that “[t]his post -Sheward precedent conclusively establishes that regulation of punitive damages is discretionary and that states may regulate and limit them as a matter of law without violating the right to trial by jury.” Even if we assume that this statement is an accurate reflection of what the United States Supreme Court held with respect to the Constitution of the United States, it is of little relevance to this case where we are determining whether R.C. 2315.21 violates the right to a trial by jury found in Section 5, Article I of the Ohio Constitution. The “post-Sheward precedent conclusively establishes” nothing with respect to Section 5, Article I of the Constitution of Ohio.
{¶ 216} R.C. 2315.21 suffers from the same flaws with respect to due process and equal protection as does R.C. 2315.18. I will not repeat that discussion in toto. But, in summary, R.C. 2315.21 should be subjected to strict scrutiny because it involves or infringes upon a fundamental right. Even if R.C. 2315.21 is subjected to rational-basis scrutiny, the findings of the General Assembly are so flawed, particularly in that they do not relate specifically to Ohio and are not objective or verifiable, that they cannot form the rational basis for enacting legislation in Ohio. The majority opinion states that “the legislative record is thin” with respect to the General Assembly’s findings on punitive damages. Even that assessment is too generous. The findings are vaporous and are not rationally related to a legitimate governmental interest.
{¶ 217} “The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct.” Moskovitz v. Mt. Sinai Med. Ctr. (1994), 69 Ohio St.3d 638, 651, 635 N.E.2d 331. See State Farm Mut. Auto. Ins. Co. v. Campbell (2003), 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (“punitive *518 damages serve a broader function; they are aimed at deterrence and retribution”). This purpose is undermined by caps, which enable wrongdoers to assess the cost of their malfeasance up front without regard to the individualized damage they cause. See Tuttle v. Raymond (Me.1985), 494 A.2d 1353, 1359 (flexibility in assessing punitive damages is “necessary to avoid situations where the potential benefits of wrongdoing could outweigh a known maximum liability”); Palmer v. A.H. Robins Co. (Colo.1984), 684 P.2d 187, 218 (“If punitive damages are predictably certain, they become just another item in the cost of doing business, much like other production costs, and thereby induce a reluctance on the part of the manufacturer to sacrifice profit by removing a correctible defect”). See also Mallor & Roberts, Punitive Damages: Toward a Principled Approach (1999), 50 Hastings L.J. 969, 995 (“The deterrent effect of punitive damages would be minimized if a person contemplating wrongful conduct could gauge his or her maximum liability in advance”).
(¶ 218} R.C. 2315.21 is unconstitutional because it infringes on the right to a trial by jury and violates due process and equal protection.
III. Conclusion
{¶ 219} I have a basic philosophical difference with the members of the majority and what they have written in the majority opinion. I believe that the Constitution of Ohio is the fundamental document that protects all Ohioans, not just those with the most lobbying power. I believe that the Constitution says what it says for a reason and that no part of our judicial system exists merely to enable the General Assembly to write around the Constitution. I believe that the Constitution should be altered only by amendment, not by legislative or judicial fiat. I believe that the Ohio Constitution is a CONSTITUTION, not just another statute modifiable at will by the General Assembly. See Tocqueville, Democracy in America (Heffner Ed.1956) 74-75 (“In the United States, the Constitution governs the legislator as much as the private citizen * * *, and it is therefore just that the tribunals should obey the constitution in preference to any law”). If the General Assembly had the courage of its convictions it would submit caps to the voters - that is the proper way to amend the Constitution. See Section 1, Article XVI of the Ohio Constitution. If the members of the majority had the courage of their convictions, they would not allow the General Assembly to circumvent the amendment process.
{¶ 220} Was there ever any doubt how this case would come out? The members of the majority have long talked about judicial restraint. But, in recent high-profile cases, certain members of the majority rewrote Section 16, Article II of the Ohio Constitution into a sad caricature of itself, see State ex rel. Ohio Gen. Assembly v. Brunner, 114 Ohio St.3d 386, 2007-Ohio-3780, 872 N.E.2d 912, and created, in Ohio anyway, the concept of executive privilege, State ex rel. Dann v. *519 Taft, 109 Ohio St.3d 364, 2006-Ohio-1825, 848 N.E.2d 472. And today, the members of the majority allow the evisceration of a provision of the Constitution that this court has previously stated should be jealously safeguarded. Gibbs v. Girard (1913), 88 Ohio St. 34, 47, 102 N.E. 299.
Burg, Simpson, Eldredge, Hersh & Jardine, Janet G. Abaray, Calvin S. Tregre Jr., and Melanie S. Bailey; and Center for Constitutional Litigation, P.C., Robert S. Peck, and Stephen B. Pershing, for petitioner.
Tucker, Ellis & West, L.L.P., Irene C. Keyse-Walker, Benjamin C. Sassé, and Julie A. Callsen, for respondents Johnson & Johnson, Ortho-McNeil Pharmaceutical, Inc., and Johnson & Johnson Pharmaceutical Research & Development, L.L.C.
Marc Dann, Attorney General, Stephen Carney, State Solicitor, and Sharon A. Jennings and Frank M. Strigari, Assistant Attorneys General, for respondent state of Ohio.
Volkema Thomas, L.P.A., and Michael S. Miller; Paul W. Flowers Co., L.P.A., and Paul W. Flowers; Nurenberg, Paris, Heller & McCarthy Co., L.P.A., Anthony E. Turley, and Kathleen J. St. John; Kitrick & Lewis Co., L.P.A., and Mark Kitrick, for amicus curiae Ohio Academy of Trial Lawyers, in support of petitioner.
Bernard K. Bauer Co., L.P.A., and Bernard K. Bauer, for amicus curiae Ohio Chapter of the American Board of Trial Advocates, in support of petitioner on Certified Question No. 1.
Gittes & Schulte, Frederick M. Gittes, and Kathaleen B. Schulte, for amici curiae Ohio Employment Lawyers Association, Ohio NOW Education and Legal Defense Fund, Committee Against Sexual Harassment, Ohio Conference of the NAACP, and Columbus NAACP, in support of petitioner.
Arthur, O’Neil, Mertz & Michel Co., L.P.A., and Dan Michel; Kirby, Thomas, Brandenburg & D’Amico and Michael R. Thomas; Linton & Hirshman and *520 Robert F. Linton Jr.; and Behnke, Martin & Schulte, Richard W. Schulte, and Stephen D. Behnke, for amicus curiae Mothers Against Drunk Driving, in support of petitioner.
*519 {¶ 221} Today we learn that “judicial restraint” was code for “the General Assembly can do no wrong when it comes to tort reform.” Today is a glorious day for the backers of “judicial restraint.” Today is a day of fulfilled expectations for insurance companies and manufacturers of defective, dangerous, or toxic products that cause injury to someone in Ohio. But this is a sad day for our Constitution and this court. And this is a tragic day for Ohioans, who no longer have any assurance that their Constitution protects the rights they cherish. I dissent.
*520 Micah Berman and Caris Post, for amicus curiae Tobacco Public Policy Center at Capital University Law School, in support of petitioner.
Kenneth R. Sheets, for amicus curiae Donna Ulliman, in support of petitioner.
Porter, Wright, Morris & Arthur, L.L.P., Joseph W. Ryan Jr., and Colleen L. Marshall, for amicus curiae International Association of Defense Counsel, in support of respondents.
Shook, Hardy & Bacon, L.L.P., Victor E. Schwartz, Mark A. Behrens, and Christopher E. Appel, for amici curiae National Federation of Independent Business Legal Foundation, Chamber of Commerce of the United States of America, National Association of Manufacturers, American Tort Reform Association, National Association of Mutual Insurance Companies, Property Casualty Insurers Association of America, and American Chemistry Council, in support of respondents.
Bricker & Eckler, L.L.P., Kurtis A. Tunnell, Anne Marie Sierra, and Vladimir P. Belo, for amicus curiae Ohio Alliance for Civil Justice, in support of respondents.
Porter, Wright, Morris & Arthur, L.L.P., Carolyn A. Taggart, and J.H. Huebert; Weston Hurd, L.L.P., Ronald A. Rispo, and Daniel A. Richards, for amicus curiae Ohio Association of Civil Trial Attorneys, in support of respondents.
Bricker & Eckler, L.L.P., Catherine Ballard, and Lana Knox, for amici curiae Ohio Hospital Association, Ohio State Medical Association, and Ohio Osteopathic Association, in support of respondents.
Dinsmore & Shohl, L.L.P., Frank C. Woodside III, Mark L. Silbersack, and Melissa L. Korfhage, for amicus curiae Product Liability Advisory Council, Inc., in support of respondents.

. Including the cost of litigation in a study can yield bizarre results. For instance, in one case a defendant spent approximately $75 million to defend itself against a $400,000 damages award. See Cipollone v. Liggett Group, Inc. (1992), 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407; Rabin, The Third Wave of Tobacco Tort Litigation (Sept.2001) 3-5.